[No. S105735. Aug. 28, 2003.]

OLIVIA KAHN, a Minor, etc., Plaintiff and Appellant, v.
EAST SIDE UNION HIGH SCHOOL DISTRICT et al., Defendants and
Respondents.

**COUNSEL**

Law Offices of Patrick R. McMahon, Patrick R. McMahon, Seema A. Savur, Lydia J. Carlsgaard; Rhoads Appellate Group and Steven R. Rhoads for Plaintiff and Appellant.

Robinson, Calcagnie & Robinson and Sharon J. Arkin for California Consumer Attorneys of California as Amicus Curiae on behalf of Plaintiff and Appellant.

Hoge, Fenton, Jones & Appel, Needham, Davis, Kirwan & Young, Mark E. Davis, Marc J. Cardinal and Kirsten M. Fish for Defendants and Respondents.

Hancock Rothert & Bunshoft, John E. Fagan, Paul J. Killion, Joseph P. Collins and Jill Penwarden for California Ski Industry Association as Amicus Curiae on behalf of Defendants and Respondents.

Horvitz & Levy, Julie L. Woods and Robert H. Wright for The American Youth Soccer Organization, Little League Baseball, Incorporated, California State University, The University of California and Golden Eagle Insurance Corporation as Amici Curiae on behalf of Defendants and Respondents.

Gene D. Vorobyov for Cities of San Luis Obispo, San Pablo, Santa Paula and Tracy as Amici Curiae on behalf of Defendant and Respondent East Side Union High School District.

## OPINION

**GEORGE, C. J.**—This case presents a question concerning the proper application of the doctrine of primary assumption of risk. At the time of her injury, plaintiff was a 14-year-old novice member of defendant school district's junior varsity swim team. She was participating in a competitive swim meet when she executed a practice dive into a shallow racing pool that was located on defendant school district's property and broke her neck. She alleged that the injury was caused in part by the failure of her coach, a district employee, to provide her with any instruction in how to safely dive into a shallow racing pool. She also alleged lack of adequate supervision and further that the coach breached the duty of care owed to her by insisting that she dive at the swim meet despite her objections, her lack of expertise, her fear of diving, and the coach's previous promise to exempt her from diving.

In *Knight v. Jewett* (1992) 3 Cal.4th 296 [11 Cal.Rptr.2d 2, 834 P.2d 696] (*Knight*), we considered the proper duty of care that should govern the liability of a sports participant for an injury to a coparticipant. We concluded that, in recognition of the circumstance that some risk of injury is inherent in most sports, and in order to avoid the detriment to a sport that would arise from discouraging participants from vigorously engaging in the activity, it is

appropriate to hold that a participant breaches a duty of care to a coparticipant only if he or she "intentionally injures another player or engages in conduct that is so reckless as to be totally outside the range of the ordinary activity involved in the sport." (*Id.* at p. 320.) In the present case, we recognize that the relationship of a sports instructor or coach to a student or athlete is different from the relationship between coparticipants in a sport. But because a significant part of an instructor's or coach's role is to challenge or "push" a student or athlete to advance in his or her skill level and to undertake more difficult tasks, and because the fulfillment of such a role could be improperly chilled by too stringent a standard of potential legal liability, we conclude that the same general standard should apply in cases in which an instructor's alleged liability rests primarily on a claim that he or she challenged the player to perform beyond his or her capacity or failed to provide adequate instruction or supervision before directing or permitting a student to perform a particular maneuver that has resulted in injury to the student. A sports instructor may be found to have breached a duty of care to a student or athlete only if the instructor intentionally injures the student or engages in conduct that is reckless in the sense that it is "totally outside the range of the ordinary activity" (*ibid.*) involved in teaching or coaching the sport.

Applying this standard to the present case, we conclude that, on the basis of the declarations and deposition testimony filed in support of and in opposition to defendants' motion for summary judgment, the Court of Appeal majority erred in determining that the doctrine of primary assumption of risk warranted entry of summary judgment in defendants' favor. We conclude that the totality of the circumstances precludes the grant of defendants' motion for summary judgment. Specifically, we refer to evidence of defendant coach's failure to provide plaintiff with training in shallow-water diving, his awareness of plaintiff's intense fear of diving into shallow water, his conduct in lulling plaintiff into a false sense of security by promising that she would not be required to dive at competitions, his last-minute breach of this promise in the heat of a competition, and his threat to remove her from competition or at least from the meet if she refused to dive. Plaintiff's evidence supports the conclusion that the maneuver of diving into a shallow racing pool, if not done correctly, poses a significant risk of extremely serious injury, and that there is a well-established mode of instruction for teaching a student to perform this maneuver safely. The declarations before the trial court raise a disputed issue of fact as to whether defendant coach provided any instruction at all to plaintiff with regard to the safe performance of such a maneuver, as well as to the existence and nature of the coach's promises and threats. Under these circumstances, the question whether the coach's conduct was reckless in that it fell totally outside the range of ordinary activity involved in teaching or

coaching this sport cannot properly be resolved on summary judgment. Accordingly, the judgment of the Court of Appeal is reversed.

## I

On October 11, 1995, plaintiff Olivia Kahn brought this action through her mother Sandy Kahn as guardian ad litem. Plaintiff's complaint named East Side Union High School District (District), Andrew McKay (McKay), and Does 1–10 as defendants. Plaintiff alleged generally that on October 13, 1994, she was present on the District's property to participate in a swim meet as a member of the Mt. Pleasant High School women's junior varsity swim team. She broke her neck while attempting a practice dive from a starting block into the three-and-one-half-foot-deep racing pool located at the school.

Plaintiff alleged that McKay, a District employee who was her coach on the swim team, negligently failed to train, supervise, or control the swim team members to protect them adequately against diving accidents, and that McKay negligently directed her to dive off a starting block during competition, without giving her adequate training or supervision, thus proximately causing her injury.[1]

After filing their answer, defendants moved for summary judgment. They contended generally that plaintiff assumed the risks inherent in the sport of competitive swimming when she voluntarily joined the swim team and dove into the pool on the day she was injured.

The declarations and the deposition transcripts that were submitted in support of and in opposition to defendants' motion for summary judgment reveal the following facts.

Mt. Pleasant High School has a deep swimming pool used for diving and water polo, as well as a racing pool used by the school's swim teams. The racing pool is three and a half feet deep at each end. On the deck in front of each of the six swimming lanes in this pool is a starting block standing 18

---

[1] Plaintiff also alleged that the District negligently failed to provide adequate supervision, training, or control of its coaches. The latter claim against the District has not been pursued in this court.

Plaintiff's complaint also alleged a cause of action for premises liability against the District. She alleged that the rubber on the starting block from which she dove was worn, that the District had actual or constructive notice of the worn condition of the starting block, and that its failure to take corrective measures resulted in the injury she sustained. The trial court granted the District's motion for summary judgment with respect to this cause of action, and the Court of Appeal affirmed. Plaintiff did not seek review of this determination, so it is not before us.

inches above the water level. These specifications conform to the then applicable guidelines formulated by the 1994 National Federation of State High School Associations.

Plaintiff was a 14-year-old freshman at Mt. Pleasant High School when she joined the school's junior varsity swim team. Two coaches were employed by the District and supervised the swimming program: defendant Andrew McKay and Kathleen Chiaramonte-Tracy. Plaintiff did not have prior experience as a competitive swimmer, but she was a competent swimmer and had executed dives into deep water on a recreational basis. She recalled that during a team practice session, coach McKay directed other team members to help her practice diving off the deck of the diving pool into deep water. Coach Chiaramonte-Tracy observed her dives, plaintiff asserted, and stated that plaintiff needed more practice. Teammates remarked that plaintiff had gone in too deep. Plaintiff had a deep-seated fear that she would suffer a traumatic head injury from diving into shallow water, and had so informed the two coaches when she joined the team in September. She alleged that during the few weeks between the commencement of the swim season and the accident, the coaches failed to offer her any instruction or training in shallow-water racing diving, nor, prior to the date of her accident, did she receive such instruction from her teammates. McKay assured her that, although three out of the four team members who participate in a relay must dive into the pool, plaintiff would not be required to dive at meets. Rather, she would be the team member who started from inside the pool. At the two or three meets that preceded the occasion on which plaintiff was injured, McKay directed plaintiff to execute the first leg of the relay race, which caused her to start in the water rather than from the deck of the pool.

Plaintiff asserted that McKay informed her, minutes before the meet was to begin on October 13, 1994, that this time he would not permit her to start her relay from inside the pool. She panicked and begged him to change the rotation so she could start in the water. She reiterated that she was afraid to dive into the shallow pool, that she did not know how to perform a racing dive, and that she never had performed one. McKay, she claimed, informed her that unless she dove off the starting block, he would not permit her to participate. (She could not recall whether he said she could not participate in the meet or could not be on the team.) She claimed that he did not give her the option of diving from the deck of the pool. Two teammates offered to show plaintiff how to perform the racing dive, and without any coach's supervision she began to practice diving from the starting block into the shallow racing pool. Plaintiff asserted that the coaches had not directed her to refrain from practicing unless they were present. Plaintiff could see coach McKay in her peripheral vision. On her third practice dive, she broke her neck.

In support of her opposition to defendants' motion for summary judgment, plaintiff offered a Red Cross safety training manual for swim coaches, a manual whose recommendations McKay stated that he followed. The manual notes that diving into water less than five feet deep is dangerous and that 95 percent of swimming injuries occur in water five feet deep or less. The manual states: "Even an experienced diver can be seriously injured by diving improperly . . . or diving from starting blocks without proper training and supervision." The manual also states that "[i]t is important that swim coaches take all reasonable precautions to prevent accidents in shallow water entries." Coaches should require persons learning the racing dive to perform adequate shallow dives from the deck into the deep pool on a consistent basis, then require students to perform a shallow dive from a starting block into the deep pool. This is important, the manual declares, "because of the increased velocity the swimmer achieves from entering the water from an increased height." Then, "[w]hen the swimmer's skill level has been consistently established from the starting block in deep water and the swimmer is able to maintain his or her racing start depth at two to two and a half feet, the swimmer may proceed to the shallow end. The coach then takes the swimmer through the same steps, beginning with shallow dives from the deck and then moving up to the block."

Plaintiff's expert, Stanley Shulman, had been a certified water safety instructor for 40 years, had coached junior and senior high school swimming for 17 years, and had published a number of studies of swimming injuries. He stated that diving into three and a half feet of water from the deck of a pool or from a starting block is extremely dangerous, and is ultrahazardous if done by a swimmer without adequate training. The sequence of instruction laid out in the Red Cross manual should be strictly followed, he declared, and "[b]efore an inexperienced diver attempts a racing dive into a shallow pool, [he or she] should perfect the same dive off starting blocks in the deep pool. [¶] The dive should be consistently done in the deep pool at a depth not exceeding two to two and a half feet before attempting it in shallow water."

In his declaration and deposition testimony, defendant McKay explained that in a relay race, four swimmers participate and only the first swimmer may begin in the pool. The remaining swimmers must dive either from the starting block or from the side of the pool. There had been approximately three meets before plaintiff's accident, and in each one plaintiff was the first swimmer and started from inside the pool. On the day of plaintiff's accident, McKay informed plaintiff that she would not be swimming the first leg of the relay. He was unaware that she thereafter began practicing diving from the starting block. On the date of the accident, when he instructed plaintiff to take the second leg of the relay, he also informed her that she could dive off the pool deck if she wished. He also recalled instructing team members that they

should be under a coach's direct supervision when they practiced diving either from the deck or the starting block.

McKay recalled that the swim team practices included diving practice twice a week and that he and Chiaramonte-Tracy did provide plaintiff training in diving. He may have demonstrated the racing dive himself, but for the most part he had plaintiff observe advanced swimmers on the team. He worked with plaintiff in a group and also individually. He followed the Red Cross training suggestions, starting plaintiff with dives into the deep diving pool until he believed she was competent to practice diving into the shallow pool. There were no starting blocks, however, at the diving pool. He recalled giving plaintiff approximately four training sessions in the deep pool and seeing her perform five to 10 dives during at least one of these practice sessions. He believed her technique in the diving pool had improved to the point that she could dive off the deck into the racing pool. He recalled seeing plaintiff dive from the deck into the racing pool at one or two practices. He believed he observed about five dives from the deck into the racing pool, and plaintiff's performance was acceptable. He stated he also saw her go off the starting block in a racing dive into the racing pool at one of these practice sessions.

Kathleen Chiaramonte-Tracy, also a teacher employed by the District, shared coaching responsibilities for the girls' swim team with McKay. She stated that McKay was responsible for the practices and meets and for teaching diving, and that she "facilitated" and performed administrative duties. She was present at practice, which occurred five days a week, and the only time she recalled observing plaintiff dive was "one or two times I saw her do the entry level dive off the side of the diving well." Plaintiff went in a little too deep, according to Chiaramonte-Tracy. Nonetheless, she declared that plaintiff must have performed other dives "because of the different practice structures that were in place." Chiaramonte-Tracy did not recall ever observing plaintiff dive into the shallow racing pool before the accident, and she never attempted to teach plaintiff how to dive off a starting block. She did not recall that she or McKay forbade the students to dive off the starting blocks unless a coach was present, nor did she give or hear McKay give instructions about the danger of improper diving into shallow water.

On January 14, 2000, the trial court granted summary judgment in favor of defendants. It found that, under the doctrine of primary assumption of risk, defendants could not be liable unless they had elevated the risks inherent in competitive swimming or had behaved recklessly. Viewing the evidence in the light most favorable to plaintiff, the trial court determined that defendants were entitled to judgment as a matter of law and entered judgment in their favor. Plaintiff's motion for new trial was denied, and she appealed.

In February 2002, the Court of Appeal affirmed the grant of summary judgment on the theory that the doctrine of primary assumption of risk barred plaintiff's claim. In a split decision, the court concluded that shallow-water diving is a fundamental part of competitive swimming and that such diving presents a danger that is an inherent risk of the sport.

In reaching its decision, the court considered whether defendants should be liable for plaintiff's injury because they "pushed plaintiff beyond her capabilities or because they increased her risk in some other way." The majority determined that, assuming coach McKay required plaintiff to compete at a level beyond her existing skill level, coaches who merely challenge their students to move beyond their current level of performance have not breached a duty of care.

With respect to plaintiff's claim that McKay increased the risks inherent in competitive swimming by breaking his promise that she would not be required to dive at meets, the majority reasoned: "As we explained *ante*, coaches who merely challenge their students to improve their skills should not be subject to tort liability. We see no reason in policy or law to apply a harsher rule to coaches who issue such challenges after previously assuring their students that they would not be encouraged or required to learn new skills. More to the point, plaintiff was not forced to accept her coach's challenge; she could have refused to swim. By voluntarily rising to the challenge of attempting an unfamiliar dive, plaintiff assumed the risk that she would be unable to meet that challenge. [Citations.] It also bears noting that neither the coach's challenge nor his broken promise caused plaintiff's injury, nor did either act increase the inherent risk of the harm plaintiff faced." The Court of Appeal majority also determined that even if the coach did not explain the hazards of diving to plaintiff, she was well aware of those hazards—as her emphatic expressions of fear had established.

Finally, the Court of Appeal majority concluded, it would be speculative to conclude that more training or supervision would have prevented the injury. The majority recognized that factual disputes remained with respect to plaintiff's claim that defendants increased the risks inherent in competitive swimming because defendants (1) failed to provide her with adequate diving instruction, (2) did not require her to practice sufficiently, and (3) did not supervise her adequately. "In our view," the majority countered, "plaintiff's argument that more training, practice, or supervision would have prevented the injury is speculative." It reached this conclusion despite the declaration of plaintiff's expert that the coach's failure to instruct plaintiff increased the inherent risk of the sport. In fact, the majority declared that it was disregarding the declaration of the expert, apparently on the theory that " '[i]t will always be possible for a plaintiff who suffers a sports injury to obtain expert

testimony that the injury would not have occurred if the recreation provider had done something differently. Such expert testimony is not sufficient to establish that the recreation provider increased the inherent risks of the sport. Such expert opinion does not create a triable issue of fact on a motion for summary judgment based on the primary assumption of the risk defense.' " In sum, the majority concluded, the injury was not caused by any act or omission of the coach that increased the inherent risk of the sport, but rather by plaintiff's own action in choosing to participate in a dangerous sport, choosing to remain in competition after the coach insisted she would have to dive, and independently deciding to practice the race dive prior to the competition.

One Court of Appeal justice dissented, observing that school districts have a duty of due care in supervising their students. The dissent noted that the applicability of the defense of primary assumption of risk should be determined by the court as a matter of law only in the absence of material factual disputes. In the present case, the dissenting justice insisted, there was a material factual dispute as to whether defendants' conduct increased the risk of harm over that inherent in competitive swimming. The factual dispute related to whether plaintiff was instructed on how to execute a racing dive into shallow water. "[O]ne increases the risk of harm over that inherent in a sport when an authority figure, such as a coach, pushes a young person to engage in a dangerous maneuver without first providing basic instruction." The dissenting justice refused to accept that "simply because plaintiff desires to engage in a high school sport, those who otherwise would owe her a duty of care are absolved of that duty under the circumstances here presented. An inexperienced high school freshman takes up a sport, not only to compete, but also to learn. And whereas a part of learning comes from being challenged, an instructor has a duty to avoid unreasonable risk of injury to his or her pupil. [¶] Plaintiff's evidence was that she was panicked by the prospect of having to dive into a shallow pool, had told her coach about her fears, and was promised that it would not be required. To then, in the midst of a competitive meet, demand that she execute that very dive, raises a triable issue as to whether she was inappropriately taken beyond her level of experience and capability, placing her in a situation that presented an unreasonable risk of injury." Further, the dissenting justice maintained, recognizing a duty to provide sufficient training would not chill vigorous competition, but rather might well have just the opposite effect.

We granted plaintiff's petition for review.

## II

■ A defendant's motion for summary judgment should be granted if no triable issue exists as to any material fact and the defendant is entitled to a

judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) The burden of persuasion remains with the party moving for summary judgment. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850, 861 [107 Cal.Rptr.2d 841, 24 P.3d 493].) When the defendant moves for summary judgment, in those circumstances in which the plaintiff would have the burden of proof by a preponderance of the evidence, the defendant must present evidence that would preclude a reasonable trier of fact from finding that it was more likely than not that the material fact was true (*id.* at p. 851), or the defendant must establish that an element of the claim cannot be established, by presenting evidence that the plaintiff "does not possess and cannot reasonably obtain, needed evidence." (*Id.* at p. 854.) We review the record and the determination of the trial court de novo. (*Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 476 [110 Cal.Rptr.2d 370, 28 P.3d 116].)

A

■ Although persons generally owe a duty of due care not to cause an unreasonable risk of harm to others (Civ. Code, § 1714, subd. (a)), some activities—and, specifically, many sports—are inherently dangerous. Imposing a duty to mitigate those inherent dangers could alter the nature of the activity or inhibit vigorous participation. In a game of touch football, for example, there is an inherent risk that players will collide; to impose a general duty on coparticipants to avoid the risk of harm arising from a collision would work a basic alteration—or cause abandonment—of the sport. We addressed this problem in *Knight, supra,* 3 Cal.4th 296.

In *Knight, supra,* 3 Cal.4th 296, we examined the doctrine of assumption of risk in light of the principle of comparative fault. We observed that the term "assumption of risk" had been used in connection with two classes of cases: those in which the issue to be resolved was whether the defendant actually owed the plaintiff a duty of care (primary assumption of risk), and those in which the defendant had breached a duty of care but where the issue was whether the plaintiff had chosen to face the risk of harm presented by the defendant's breach of duty (secondary assumption of risk). (*Id.* at pp. 303–304, 308.) In the latter class of cases, we concluded, the issue could be resolved by applying the doctrine of comparative fault, and the plaintiff's decision to face the risk would not operate as a complete bar to recovery. In such a case, the plaintiff's knowing and voluntary acceptance of the risk functions as a form of contributory negligence. (*Id.* at pp. 308, 310–311.)

As for the first class of cases, however, we held that the plaintiff's claim should be barred entirely because of a *legal* determination that the defendant did not owe a duty to protect the plaintiff from the particular risk of harm involved in the claim. (*Knight, supra,* 3 Cal.4th at pp. 310, 314–315.) We

observed that such cases frequently arise in the context of active sports, and warned that "the question whether the defendant owed a legal duty to protect the plaintiff from a particular risk of harm does not turn on the reasonableness or unreasonableness of the plaintiff's conduct, but rather on the nature of the activity or sport in which the defendant is engaged and the relationship of the defendant and the plaintiff to that activity or sport." (*Id.* at p. 309; see also *id.* at pp. 316–317; *Cheong v. Antablin* (1997) 16 Cal.4th 1063, 1068 [68 Cal.Rptr.2d 859, 946 P.2d 817].) We emphasized that the question of "the existence and scope" of the defendant's duty is one of law to be decided by the court, not by a jury, and therefore it generally is "amenable to resolution by summary judgment." (*Knight, supra,* 3 Cal.4th at p. 313.)

Looking first at the nature of the sport, we observed that "[i]n the sports setting . . . conditions or conduct that otherwise might be viewed as dangerous often are an integral part of the sport itself." (*Knight, supra,* 3 Cal.4th at p. 315.) We explained that, as a matter of policy, it would not be appropriate to recognize a duty of care when to do so would require that an integral part of the sport be abandoned, or would discourage vigorous participation in sporting events. Accordingly, defendants generally do not have a duty to protect the plaintiff from the risks inherent in the sport, or to eliminate risk from the sport, although they generally do have a duty not to increase the risk of harm beyond what is inherent in the sport. (*Id.* at pp. 315–316.)

 But the question of duty depends not only on the nature of the sport, but also on the "role of the defendant whose conduct is at issue in a given case." (*Knight, supra,* 3 Cal.4th at p. 318.) Duties with respect to the same risk may vary according to the *role* played by particular defendants involved in the sport. In the sport of baseball, for example, although the batter would not have a duty to avoid carelessly throwing the bat after getting a hit—vigorous deployment of a bat in the course of a game being an integral part of the sport—a stadium owner, because of his or her different relationship to the sport, may have a duty to take reasonable measures to protect spectators from carelessly thrown bats. For the stadium owner, reasonable steps may minimize the risk without altering the nature of the sport. (*Id.* at p. 317.)

When in *Knight, supra,* 3 Cal.4th 296, we examined whether particular defendants, namely *coparticipants* in an active sport such as touch football, may be held liable to each other, we stressed the role of the participant in the sport *and* the likely effect on the sport of imposing liability on such persons. To impose liability on a coparticipant for "normal energetic conduct" (*id.* at p. 318) while playing—even careless conduct—could chill vigorous participation in the sport. "The cases have recognized that, in such a sport, even when a participant's conduct violates a rule of the game and may subject the violator to internal sanctions prescribed by the sport itself,

imposition of *legal liability* for such conduct might well alter fundamentally the nature of the sport by deterring participants from vigorously engaging in activity . . . ." (*Id.* at pp. 318–319; see also *Ford v. Gouin* (1992) 3 Cal.4th 339, 345 [11 Cal.Rptr.2d 30, 834 P.2d 724].) Accordingly, we concluded that coparticipants breach a duty of care to each other only if they "intentionally injure[] another player or engage[] in conduct that is so reckless as to be totally outside the range of the ordinary activity involved in the sport." (*Knight, supra,* 3 Cal.4th at p. 320.)[2]

In *Knight, supra,* 3 Cal.4th 296, we pointed out that tort claims have been brought against persons fulfilling different roles in sports, including owners of sports facilities, manufacturers of sports equipment, and coaches and instructors, and we acknowledged the potential that an instructor's role in a sport would be relevant to the application of the doctrine of primary assumption of risk.

We had occasion to comment in passing on an instructor's duty in *Parsons v. Crown Disposal Co.* (1997) 15 Cal.4th 456 [63 Cal.Rptr.2d 291, 936 P.2d 70].) In that case, a rider who had been thrown from his horse asserted that a garbage truck driver had a duty not to increase the risk of harm to the rider by permitting his truck to make sudden loud noises in the vicinity of horse and rider. We rejected the claim that *Knight, supra,* 3 Cal.4th 296, imposed an expansive duty on all persons, even those not involved in the sport, to avoid increasing the risk of harm inherent in a sporting activity. (*Parsons v. Crown Disposal Co., supra,* 15 Cal.4th at pp. 461–462.) The truck driver did not have a duty to avoid increasing the risk of harm posed by horseback riding. The reason, of course, is that the truck driver did not have a role in the sport or a relationship with the plaintiff. (*Id.* at pp. 481–482.) The duty not to increase the risk of harm discussed in *Knight, supra,* 3 Cal.4th 296, flowed from the nature of the coparticipants' activities and their relationship to each other and to the activity. (*Parsons v. Crown Disposal Co., supra,* 15 Cal.4th at p. 482.) Citing Court of Appeal cases that had been decided subsequent to our decision in *Knight, supra,* 3 Cal.4th 296, we explained that "there are circumstances in which the relationship between defendant and plaintiff gives rise to a duty on the part of the defendant to use due care not to increase the risks inherent in the plaintiff's activity. For example, a purveyor of recreational activities owes a duty to a patron not to increase the risks inherent in the activity in which the patron has paid to engage. [Citations.] Likewise, *a coach or sport instructor owes a duty to a student not to increase the risks inherent in the learning process undertaken*

---

[2] The analysis set out above continues to be applied in this court. (See *Cheong v. Antablin, supra,* 16 Cal.4th at p. 1067 [noting that although only three judges signed the plurality opinion in *Knight, supra,* 3 Cal.4th 296, Justice Mosk's concurring opinion was in general agreement with the plurality analysis, and noting unanimous application of the plurality analysis in this court's later cases].)

*by the student.* (See, e.g., *Tan v. Goddard* (1993) 13 Cal.App.4th 1528 [17 Cal.Rptr.2d 89] [horse jockey school]; *Galardi v. Seahorse Riding Club* (1993) 16 Cal.App.4th 817 [20 Cal.Rptr.2d 270] [horse jumping instruction]; *Fortier v. Los Rios Community College Dist.* (1996) 45 Cal.App.4th 430 [52 Cal.Rptr.2d 812] [football class]; *Regents of University of California v. Superior Court* (1996) 41 Cal.App.4th 1040 [48 Cal.Rptr.2d 922] [mountain climbing class].)" (*Parsons v. Crown Disposal Co., supra,* 15 Cal.4th at p. 482, italics added.)

The general proposition that a sports instructor or coach owes a duty of due care not to increase the risk of harm inherent in learning an active sport is consistent with a growing line of Court of Appeal opinions that have applied the *Knight, supra,* 3 Cal.4th 296, analysis to claims against such defendants. In these cases, the reviewing courts examined the particular circumstances of the sport, its inherent risks, and the relationship of the parties to the sport and to each other. Most also examined the question whether imposing broader liability on coaches and instructors would harm the sport or cause it to be changed or abandoned. In each instance, the Courts of Appeal have agreed that although the coach or athletic instructor did not have a duty to eliminate the risks presented by a sport, he or she did have a duty to the student not to increase the risk inherent in learning, practicing, or performing in the sport. (*Rodrigo v. Koryo Martial Arts* (2002) 100 Cal.App.4th 946, 956 [122 Cal. Rptr. 2d 832]; *West v. Sundown Little League of Stockton, Inc.* (2002) 96 Cal.App.4th 351, 358 [116 Cal.Rptr.2d 849]; *Kane v. National Ski Patrol System, Inc.* (2001) 88 Cal.App.4th 204, 212 [105 Cal.Rptr.2d 600]; *Lupash v. City of Seal Beach* (1999) 75 Cal.App.4th 1428, 1436 [89 Cal.Rptr.2d 920]; *Lilley v. Elk Grove Unified School Dist.* (1998) 68 Cal.App.4th 939, 944 [80 Cal.Rptr.2d 638]; *Balthazor v. Little League Baseball, Inc.* (1998) 62 Cal.App.4th 47, 50 [72 Cal.Rptr.2d 337]; *Allan v. Snow Summit, Inc.* (1996) 51 Cal.App.4th 1358, 1369 [59 Cal.Rptr.2d 813]; *Bushnell v. Japanese-American Religious & Cultural Center* (1996) 43 Cal.App.4th 525, 532 [50 Cal.Rptr.2d 671].)

Subsequent decisions have clarified that the risks associated with *learning* a sport may themselves be inherent risks of the sport, and that an instructor or coach generally does not increase the risk of harm inherent in learning the sport simply by urging the student to strive to excel or to reach a new level of competence. This line of cases analyzes and articulates an important and appropriate limitation on the duty of a sports instructor. The cases point out that instruction in a sport frequently entails challenging or "pushing" a student to attempt new or more difficult feats, and that "liability should not be imposed simply because an instructor asked the student to take action beyond what, with hindsight, is found to have been the student's abilities." (*Bushnell v. Japanese-American Religious & Cultural Center, supra,* 43 Cal.App.4th at p. 532.) As a general matter, although the nature of

the sport and the relationship of the parties to it and to each other remain relevant, a student's inability to meet an instructor's legitimate challenge is a risk that is inherent in learning a sport. To impose a duty to mitigate the inherent risks of learning a sport by refraining from challenging a student, as these cases explain, could have a chilling effect on the enterprise of teaching and learning skills that are necessary to the sport. At a competitive level, especially, this chilling effect is undesirable.

The first in this line of decisions is *Bushnell v. Japanese-American Religious & Cultural Center, supra,* 43 Cal.App.4th 525, [50 Cal.Rptr.2d 671] (*Bushnell*). In that case a student of judo was practicing a routine with his instructor. After running through the routine two dozen times at increasing speeds with the instructor as his partner, the student tripped and broke his leg. The court rejected the notion that the instructor's superior control over the activity required recognition of a general duty of care, although the court acknowledged that the student-teacher relationship was relevant to the question of liability. Asking whether "vigorous participation in the sport might be chilled if liability attached for careless conduct" (*id.* at p. 531), the court concluded that imposition of liability in this situation would be inconsistent with the principles underlying this court's decision in *Knight, supra,* 3 Cal.4th 296. The instructor's conduct was itself an inherent risk of the sport, the court found, and the instructor did nothing to increase that risk. "Instruction in an activity such as judo necessarily requires pushing a student to move more quickly, attempt a new move, or take some other action that the student previously may not have attempted. That an instructor might ask a student to do more than the student can manage is an inherent risk of the activity. *Absent evidence of recklessness, or other risk-increasing conduct, liability should not be imposed simply because an instructor asked the student to take action beyond what, with hindsight, is found to have been the student's abilities.* To hold otherwise would discourage instructors from requiring students to stretch, and thus to learn, and would have a generally deleterious effect on the sport as a whole." (*Bushnell, supra,* 43 Cal.App.4th at p. 532, italics added.)

In reaching its conclusion, the court in *Bushnell, supra,* 43 Cal.App.4th 525, explained that it disagreed with two earlier decisions, *Tan v. Goddard, supra,* 13 Cal.App.4th 1528, and *Galardi v. Seahorse Riding Club, supra,* 16 Cal.App.4th 817, to the extent they suggested that a coach's liability might follow from ordinary negligence or simply from requiring a student to take on a new challenge in order to improve skills—"at least in the absence of evidence that the instructor acted recklessly or with an intent to cause injury." (*Bushnell, supra,* 43 Cal.App.4th at pp. 533–534.) Those cases could be explained on the ground that the instructors' conduct arguably *was* reckless, in the view of the *Bushnell* court, but were unsupportable to the extent they suggested that liability would follow when a coach or instructor merely urged

the student to follow a desirable sequence of training and execute a maneuver that turned out to be beyond the student's capacity. (*Id.* at p. 534.) The court continued: "Any other rule would discourage instructors from asking their students to do anything more than they have done in the past, and would therefore have a chilling effect on instruction, and thus would have a negative impact on the very purpose for seeking instruction: mastering the activity." (*Ibid.*) Finding no evidence of recklessness or intent to injure the plaintiff, or any evidence that the plaintiff was injured by "anything other than an inherent risk attending the activity of attempting to learn or improve the skills used in judo," the Court of Appeal concluded that the doctrine of primary assumption of risk barred the plaintiff's claim. (*Id.* at p. 535.)

A number of Court of Appeal decisions agree with the *Bushnell* conclusion that pushing an athlete to compete, excel, or move to the next level of competence ordinarily does not form a basis for liability on the part of athletic instructors and coaches. (See *Rodrigo v. Koryo Martial Arts, supra,* 100 Cal.App.4th at pp. 954–956 [tae kwon do drill necessarily involved risk of injury from being kicked; instructor did not increase the risks inherent in learning the sport]; *Kane v. National Ski Patrol System, Inc., supra,* 88 Cal.App.4th at pp. 211–212 [instructor of aspiring ski patrol members may have misassessed their skill level and the hazards of the terrain, but did not recklessly increase the risk inherent in improving skills to the level required for ski patrol members]; *Lilley v. Elk Grove Unified School Dist., supra,* 68 Cal.App.4th at p. 944 [wrestling coach was not liable to pupil he injured during a challenging practice]; *Balthazor v. Little League Baseball, Inc., supra,* 62 Cal.App.4th 47 [coach did not increase the risks inherent in learning to play baseball by continuing practice in twilight or by failing to remove an errant pitcher]; *Allan v. Snow Summit, Inc., supra,* 51 Cal.App.4th at pp. 1368–1369 [instructor of novice skier did not increase the risks inherent in learning the sport by directing the student to attempt a more difficult run]; see also *West v. Sundown Little League of Stockton, Inc., supra,* 96 Cal.App.4th at pp. 357–358 [baseball coach did not increase the risk inherent in the sport by challenging students or by allowing them to practice when the sun was in their eyes]; *Lupash v. City of Seal Beach, supra,* 75 Cal.App.4th at pp. 1436–1439 [no liability for asserted negligent instruction of junior lifeguard in safety procedures]; *Aaris v. Las Virgenes Unified School Dist.* (1998) 64 Cal.App.4th 1112, 1117–1118 [75 Cal.Rptr.2d 801] [cheerleading coach did not increase risks inherent in dangerous activity]; *Fortier v. Los Rios Community College Dist., supra,* 45 Cal.App.4th at pp. 435–437 [coach/instructor may urge aggressive play in football practice without incurring liability].)

For example, the court in *West v. Sundown Little League of Stockton, Inc., supra,* 96 Cal.App.4th 351, faced with a declaration by plaintiff's expert that the coach had challenged Little League players beyond their skill level

because the coach "should have known that catching pop flies in the sun was a skill beyond the level of first-year [Little League] players," concluded that "losing sight of a pop fly in the sun is a risk inherent in baseball no matter what the level of play" and that the coach had not increased that inherent risk. (*Id.* at p. 359.) It added, agreeing with the court in *Bushnell, supra,* 43 Cal.App.4th 525, 531–534, that coaches and instructors should not be held liable for injuries caused by encouraging athletes to perform beyond their existing level of competence. "Coaches must be free to push their players to levels that may, in hindsight, be beyond the students' abilities." (*West v. Sundown Little League of Stockton, Inc., supra,* 96 Cal.App.4th at p. 360.)

In another example, a court barred a claim that a ski instructor had pushed a student to perform beyond his skill level. (*Allan v. Snow Summit, Inc., supra,* 51 Cal.App.4th 1358.) A beginning adult skier returned for a second day of lessons and was told by his instructor that he was ready to leave the beginners' slope, and that in order to learn to ski he must be aggressive and seek out challenges. As directed by the instructor, the student went to a more advanced slope and suffered back injury after numerous falls that occurred as he skied down the icy slope. The Court of Appeal recognized that some cases have imposed liability on coaches and instructors but that these cases "involved not merely the fact of a coach/student relationship, but also evidence that the coach actively did something—besides teaching, encouraging, or 'pushing' the student—which increased the risk of injury *beyond* the risks inherent in the sport." (*Id.* at p. 1369.) Under the facts alleged in the case before it, however, the court found the plaintiff's claim barred by the doctrine of primary assumption of risk, because the teacher "simply instructed, encouraged and challenged [the plaintiff]; [and] the instrumentalities of his injury consisted only of his inability to meet the instructor's challenge (inherent in learning a sport), falling (inherent in skiing), and icy conditions (inherent in skiing)." (*Id.* at p. 1372.)

A final example demonstrates why it would be inconsistent with *Knight, supra,* 3 Cal.4th 296, to impose liability on a coach or instructor on the basis of ordinary negligence in urging students to go beyond their current level of competence. In *Kane v. National Ski Patrol System, Inc., supra,* 88 Cal.App.4th 204 (*Kane*), an adult married couple with 30 years of experience in skiing sought to become volunteer members of a resort's ski patrol. In order to qualify for ski patrol, the National Ski Patrol System required that skiers demonstrate that they could ski the most advanced slope in the area to be patrolled in a " 'strong competent manner' " and that they could ski all slopes in all snow and weather conditions. Skiers also were required to successfully tow a rescue toboggan. The couple demonstrated skills sufficient to qualify them as candidate members of the ski patrol. For 10 weekends they served on the ski patrol as candidate members and took skills clinics. On the

day of the injury, they were participating in a clinic on a double black-diamond run. The teacher led them to an ungroomed, obstacle-ridden, and icy area of the trail adjacent to a canyon. Asking what students would do if a skier had gone over the side into the canyon, he had the students follow him while he demonstrated edge control techniques. As they followed, plaintiff's decedent slid over the edge to his death, while plaintiff, attempting to rescue her husband, followed over the edge and sustained serious injury.

The trial court as trier of fact agreed with plaintiff's allegation that the teacher had acted recklessly, but the Court of Appeal reversed, applying the rationale set out in *Bushnell, supra,* 43 Cal.App.4th 525. The Court of Appeal found that, even assuming the instructor negligently had misassessed the difficulty of the terrain and the skiers' skill, no liability should lie. Falling and the risk of injury or death are inherent in skiing in difficult terrain, the court declared. The same risks of injury and death are inherent in training for the ski patrol, so the plaintiff was required to demonstrate that the instructor's conduct went beyond the risk already inherent in the attempt to develop the skills necessary for ski patrol duty. (*Kane, supra,* 88 Cal.App.4th at pp. 213–214.)

The Court of Appeal stated that "an instructor's assessment errors—either in making the necessarily subjective judgment of skill level or the equally subjective judgment about the difficulty of conditions—are in no way 'outside the range of the ordinary activity involved in the sport.' (*Knight v. Jewett, supra,* 3 Cal.4th at p. 321.) Instructors must of necessity make such judgments in order to sufficiently challenge skiers so that they will in fact improve their skills. [Citation.] Moreover, the consequence of holding a ski patrol instructor liable for such errors would be calamitous. If a ski patrol instructor's assessment of skill and conditions will support liability, we are at a loss as to what organization or person would or could take on the responsibility of training skiers to rescue other skiers. Because the ability to second-guess an instructor's assessment is essentially limitless, so too would an instructor's liability be limitless. The likely absence of a competent ski patrol would in turn endanger every skier." (*Kane, supra,* 88 Cal.App.4th at p. 214.) In conclusion, "[b]ecause the facts presented by the Kanes did not show recklessness or other conduct outside the inherent risk of training to be a ski patrol member, the trial court should have granted [the] motion for judgment [in favor of the defendants]." (*Ibid.*)

These cases appropriately reason that, even keeping in mind the role of the coach or sports instructor, the imposition of a duty to avoid challenging a student to perform beyond his or her current capacity would have a chilling effect on the enterprise of teaching and learning skills that are necessary to the sport. These decisions properly emphasize that a coach or athletic

instructor must challenge his or her students, and that learning itself can be a risky process, sometimes unavoidably so. These cases also properly recognize that while a student is engaged in the process of learning, he or she frequently is at greater risk than a proficient athlete would be, and a coach does not have a duty to eliminate all the risks presented by inexperience.

We agree that the object to be served by the doctrine of primary assumption of risk in the sports setting is to avoid recognizing a duty of care when to do so would tend to alter the nature of an active sport or chill vigorous participation in the activity. This concern applies to the process of learning to become competent or competitive in such a sport. Novices and children need instruction if they are to participate and compete, and we agree with the many Court of Appeal decisions that have refused to define a duty of care in terms that would inhibit adequate instruction and learning or eventually alter the nature of the sport. Accordingly, we believe that the standard set forth in *Knight, supra*, 3 Cal.4th 296, as it applies to coparticipants, generally should apply to sports instructors, keeping in mind, of course, that different facts are of significance in each setting. ■ In order to support a cause of action in cases in which it is alleged that a sports instructor has required a student to perform beyond the student's capacity or without providing adequate instruction, it must be alleged and proved that the instructor acted with intent to cause a student's injury or that the instructor acted recklessly in the sense that the instructor's conduct was "totally outside the range of the ordinary activity" (*Knight, supra*, 3 Cal.4th at p. 318) involved in teaching or coaching the sport.

The Court of Appeal majority in the present case concluded that in light of plaintiff's allegations and supporting evidence, coach McKay merely challenged her to go beyond her current level of competence. We believe that this takes an unduly narrow view of plaintiff's claim and her evidence, which went far beyond a claim that the coach made an ordinary error of judgment in determining that she was ready to perform the shallow-water dive.

As noted above, the Red Cross teaching manual submitted by plaintiff acknowledged that the principal danger faced by persons learning to compete in swimming is the shallow-water dive.[3] The risk presented is not simply that the swimmer might suffer bruises or even break an arm; the risk is that the student may sustain serious head and spinal cord injuries by striking the bottom of the pool. Plaintiff presented evidence, both documentary and

---

[3] Other sources confirm that the shallow-water dive, a traditional maneuver in racing, is the major source of injury in the sport of competitive swimming. (See Mueller & Cantu, National Center for Catastrophic Sports Injury Research, Twelfth Annual Report (Fall 1982–Spring 1994), published as appen. to McCaskey & Biedzynski, *A Guide to the Legal Liability of Coaches for a Sports Participant's Injuries* (1996) 6 Seton Hall J. Sport L. 7, 108–109.)

expert, that a settled progression of instruction in the dive is considered essential to a student's safety. Her own declaration and deposition testimony was that she had not received any instruction at all from her coaches or teammates on the performance of the shallow-water dive. She also claimed that she had expressed a mortal fear of performing the shallow-water dive and that she had been assured by the coach that she would not be required to perform it. Her evidence was that the coach made a last-minute demand that she take a position in the relay race that would require her to dive, threatening that if she did not comply, either she would be dropped from the team or she would not be permitted to compete that day.

Defendant McKay did not challenge the sequence of instruction prescribed by the Red Cross manual, but said in his declaration and deposition testimony that he generally followed it. His declaration and deposition testimony with regard to the amount and nature of the instruction he offered to plaintiff were in sharp contrast to plaintiff's claims. He stated that at team practice sessions, he began her diving training in the deep pool, and only moved her to the shallow pool when he felt she was ready. He believed he had observed plaintiff make about five acceptable dives from the deck into the shallow pool and that he also had seen her dive off the starting block into the shallow pool. His declaration and testimony did not concede that he had promised plaintiff she never would be required to dive, and he denied informing plaintiff that she would be off the team if she refused to dive on the day she was injured.

As the dissenting justice in the Court of Appeal pointed out, plaintiff was inexperienced. "Plaintiff's evidence was that she was panicked by the prospect of having to dive into a shallow pool, had told her coach about her fears, and was promised that it would not be required. To then, in the midst of a competitive meet, demand that she execute that very dive," in conjunction with an absence of training, presented a triable issue requiring resolution by a jury. ■ We agree that the following factors indicated a triable issue with respect to whether the coach's behavior was reckless: the lack of training in the shallow-water dive disclosed by plaintiff's evidence, especially in the face of the sequenced training recommended in the Red Cross manual submitted by plaintiff; the coach's awareness of plaintiff's deep-seated fear of such diving; his conduct in lulling her into a false sense of security through a promise that she would not be required to dive, thereby eliminating any motivation on her part to learn to dive safely; his last-minute breach of that promise under the pressure of a competitive meet; and his threat to remove her from the team or at least the meet if she refused to dive.

Clearly, a disputed issue of fact exists as to whether the coach provided any instruction at all on shallow-water diving, and the nature of the coach's promises and threats to plaintiff also are in dispute. If a jury were to find that

defendant coach directed plaintiff (a novice on the swim team) to perform a shallow racing dive in competition without providing any instruction, that he ignored her overwhelming fears and made a last-minute demand that she dive during competition, in breach of a previous promise that she would not be required to dive, we believe the trier of fact properly could determine that such conduct was reckless in that it was totally outside the range of the ordinary activity involved in teaching or coaching the sport of competitive swimming. Accordingly, on this record, we conclude that the trial court erred in granting summary judgment in favor of defendants and that the Court of Appeal erred in affirming that determination.[4]

B

The Court of Appeal majority also determined that plaintiff had not established a causal relationship between coach McKay's alleged conduct and plaintiff's injury. The court acknowledged that factual disputes remained as to whether the coach adequately trained and supervised her, but labeled as speculative the claim that instruction and supervision would have prevented the injury. In support, it cited *Aaris v. Las Virgenes Unified School Dist.*, *supra*, 64 Cal.App.4th 1112 *(Aaris)*, and *Lupash v. City of Seal Beach*, *supra*, 75 Cal.App.4th 1428 *(Lupash)*.

In *Aaris*, *supra*, 64 Cal.App.4th 1112, the Court of Appeal affirmed the trial court's grant of summary judgment in favor of a school district, holding that the doctrine of primary assumption of risk barred a high school student's claim against her coach for failing to adequately instruct or supervise dangerous stunts during cheerleading practice. The trial court placed great emphasis upon evidence establishing that the coach, a school employee, had provided many hours of formal instruction in safety and the use of proper techniques in basic cheerleading stunts and maneuvers, including the technique for the particular stunt in which plaintiff was injured. (*Id.* at pp. 1116–1117.) The coach, when the cheerleaders announced they were having difficulty with a stunt during practice, directed that they practice it again, and she "stood close by to assist." (*Id.* at p. 1115.)

The Court of Appeal, in rejecting the student's claim with respect to the coach's duty of care, also commented that the plaintiff merely *assumed* that

---

[4] Defendants object that plaintiff did not allege specifically that the coach had acted recklessly. They claim that this omission bars consideration of that basis for tort liability under the standard enunciated in *Knight*, *supra*, 3 Cal.4th 296. Contrary to this assertion, it was unnecessary for plaintiff to allege the legal conclusion that the coach's acts and omissions were reckless, because she adequately alleged facts and produced evidence sufficient to support such a conclusion. (See *Barquis v. Merchants Collection Assn.* (1972) 7 Cal.3d 94, 103 [101 Cal.Rptr. 745, 496 P.2d 817]; 4 Witkin, Cal. Procedure (4th ed. 1997) Pleading, § 374, pp. 475–476.)

more supervision would have caused the risk of harm to decrease. (*Aaris, supra,* 64 Cal.App.4th at p. 1119.) The court's decision did not turn on the issue of causation, however. Rather, the court applied the rule set forth in earlier cases that an instructor should not be liable, absent evidence of recklessness or " 'other risk-increasing conduct,' " merely because he or she " 'asked the student to take action beyond what, with hindsight, is found to have been the student's abilities.' " (*Id.* at p. 1119.)

The Court of Appeal in the present case also relied upon *Lupash, supra,* 75 Cal.App.4th 1428. In that case, a boy had been given six weeks of training as a junior lifeguard, including training in ocean safety, warnings not to dive into shallow water, and warnings regarding dangerous ocean conditions. He was engaged in a competition and, after vigorous participation in a number of events that involved running down the beach into the water, swimming a distance, and returning, he declared he was dropping out. His coach directed him to continue and not act like a baby. During the last event, he sprinted down the beach and into knee-deep water where, he declared, he stepped into a hole in the ocean floor and tripped, thereby sustaining serious injury. He claimed that he should not have been directed to run into a stretch of water in which the ocean floor had a six- to nine-inch depression close to shore; that his coach negligently instructed him as to how to enter the water safely and failed to instruct him to do a bottom check each time he entered the water; that he should not have been directed to run as fast as he could into the water without doing a bottom check; and that he should not have been directed to compete in the last race over his objection that he was exhausted and upset.

The Court of Appeal refused to recognize a duty of care that would prevent lifeguards from being trained to do anything but "walk (rather than run) down a beach before entering the water and to then carefully shuffle across the ocean floor to ascertain the bottom conditions before trying to swim. Being so ultracautious about their own personal safety, lifeguards so instructed would invariably jeopardize the safety and lives of others." (*Lupash, supra,* 75 Cal.App.4th at p. 1437.) On the issue of causation, the court "decline[d] to permit the jury to speculate whether further instruction . . . would have prevented the accident." (*Id.* at pp. 1438–1439.) The court explained that the injured boy had been in and out of the water for almost five hours, had spent a quarter of an hour walking along the beach in the shallow water, and had run into the ocean in the same general area during two previous events in the competition. "Since he found nothing unusual in the bottom conditions during any of these previous entries, we cannot conclude that yet one more bottom check would have been any more fruitful. A mere possibility of causation is not enough . . . ." (*Id.* at p. 1439.)

Relying upon these decisions, the Court of Appeal majority in the present case viewed as speculative plaintiff's claim that her coach's alleged acts and

omissions caused her injuries. If the Court of Appeal majority believed these cases established that ordinarily it is speculative to draw a causal connection between lack of instruction or supervision and injury, we disagree. The causal connection claimed in *Aaris* was speculative because the instructor herself had provided hours of instruction on safety and technique, had sent the team to a four-day residential training camp, supplied team members with video and written training resources, supervised their practices for months, and was standing by to assist as the team members performed the stunt that resulted in the plaintiff's injury. There was *no* evidence or reasonable inference that the coach's instruction or supervision or lack thereof were causally related to the injury. Similarly, in *Lupash*, the clearly adequate level of instruction, practice, and supervision led the appellate court to conclude that the defendant's conduct had not caused the plaintiff's injury.

As indicated by the evidence proffered in the present case, by contrast, the causal connection between the coach's conduct and the injury cannot be rejected as speculative at this stage. The combination of factors noted above in connection with the discussion of duty also tended to demonstrate that the coach's acts and omissions were causally related to plaintiff's injury. The Red Cross manual made part of the record below indicates that most injuries sustained by competitive swimmers result from diving into shallow water, and stresses that a specific sequence of training is necessary for the safe execution of shallow-water dives. Also relevant to causation was plaintiff's evidence that she was a complete novice but was offered no training in the shallow-water dive, in contrast to the ordinary progression of training that is recommended *to meet the serious risk of injury posed by the shallow water dive when it is performed by unskilled persons*. The coach's promise that she would not be required to dive evidently lulled her into a false sense of security and deprived her of motivation to gain diving skills. The coach's demand that she take a position in the relay that required that she dive, or else withdraw from competition, was causally related to her decision to practice the dive on her own, despite her lack of training. The evidence was uncontroverted that there were no starting blocks adjacent to the District's deep pool. Thus, it appears plaintiff had no practice in executing the shallow-water dive from a starting block into deep water, despite evidence that such practice was important in order to *cause* a reduction in the incidence of injury. In addition, coach McKay's declaration and deposition testimony indicate that he was in charge of the swim meet, was present when plaintiff was injured—possibly standing quite nearby—but was not watching her. Plaintiff's deposition and that of coach Chiaramonte-Tracy supplied evidence that team members, including plaintiff, had not been directed to refrain from practicing diving unless under the direct supervision of a coach. Under these circumstances, a factual issue was presented as to whether coach McKay's acts and omissions were causally related to plaintiff's injury.

The Court of Appeal majority also reached its decision in part because of the voluntary nature of plaintiff's conduct, the majority disputing, in passing, the value of plaintiff's expert's declaration. The expert was of the view that the coach's failure to instruct on shallow-water diving increased the risk inherent in the sport. It appears that the Court of Appeal majority was of the view that expert opinion testimony never should be sufficient to raise a triable issue of fact with respect to breach of duty when a plaintiff claims that a defendant's conduct increased the inherent risk of a sports injury. The Court of Appeal majority concluded: "Disregarding the opinion of plaintiff's expert, and putting aside plaintiff's own speculation, we simply find no evidence in the record—disputed or otherwise—that the defendants' failure to instruct or supervise increased the risk of plaintiff's injury. Rather, plaintiff was injured because she *voluntarily* participated in a dangerous activity, she *chose* to remain in the competition even though she could have refused to swim, and she *took it upon herself* to practice an unfamiliar dive without her coach's knowledge." (Italics added.)

■ We observe several flaws in this line of reasoning. The first is that with respect to the issue of the asserted breach of duty, in referring to plaintiff's voluntary participation in the sport of competitive swimming and her choice to compete at the meet and practice diving on the day she was injured, the Court of Appeal majority failed to recognize that the doctrine of primary assumption of risk, including the issue of the scope of defendants' duty of care, does not turn on plaintiff's subjective awareness of the risk or her decision to encounter it voluntarily, but on the question whether defendants owed her a duty of care. (*Knight, supra*, 3 Cal.4th at pp. 313–315.)

Second, with respect to the issue of causation and the Court of Appeal majority's emphasis that plaintiff was injured after she took it upon herself to practice on her own, we observe that there was a conflict in the evidence on the question whether plaintiff had been instructed not to practice dives on her own. Under the allegations and evidence provided by plaintiff, it was reasonably foreseeable that when the coach told plaintiff she would have to dive (for the first time) at the meet, she would see a need for practice. Under these circumstances and those referred to above, sufficient facts were produced that would support a determination that the absence of prior instruction was the proximate cause of plaintiff's injury.

The question whether plaintiff's voluntary decision to practice the shallow-water dive without supervision constituted a *supervening* cause of her injury depends on whether her conduct " 'was within the scope of the reasons imposing the duty upon the actor to refrain from negligent conduct. If the duty is designed, in part at least, to protect the other from the hazard of being harmed by the intervening force . . . then that hazard is within the duty, and

the intervening force is not a superseding cause.' . . . [F]or an intervening act properly to be considered a superseding cause, the act must have produced 'harm of a kind and degree so far beyond the risk the original tortfeasor should have foreseen that the law deems it unfair to hold him responsible.' " (*Lugtu v. California Highway Patrol* (2001) 26 Cal.4th 703, 725 [110 Cal.Rptr.2d 528, 28 P.3d 249].) Applicable California authority establishes that defendants had a duty of supervision that included an obligation to offer plaintiff some protection against her own lack of mature judgment. In *Dailey v. Los Angeles Unified School Dist.* (1970) 2 Cal.3d 741 [87 Cal.Rptr. 376, 470 P.2d 360], for example, we specifically rejected the idea that an unsupervised student's misconduct necessarily was a supervening cause of an injury, because the misconduct was something that could be expected of adolescents who are not adequately supervised. (*Id.* at pp. 750–751; see also *Mastrangelo v. West Side Union High School Dist.* (1935) 2 Cal.2d 540, 545–546 [42 P.2d 634].) We do not believe it can be determined as a matter of law that plaintiff's decision to practice shallow-water dives with the help of other students, after the coach unexpectedly told her she was to dive that day, was conduct beyond what the coach should have foreseen and forestalled.[5]

The third flaw in the reasoning of the Court of Appeal majority relates to its apparent conclusion that it should disregard the testimony of plaintiff's expert. We see no justification for disregarding the opinion of a person with 40 years' experience as a swim coach that it is important to provide a specific sequence of training in the shallow-water dive, because of the risk of injury arising when no such training is provided. Courts ordinarily do not consider an expert's testimony to the extent it constitutes a conclusion of law (see *Benavidez v. San Jose Police Dept.* (1999) 71 Cal.App.4th 853, 865 [84 Cal.Rptr.2d 157]), but we do not believe that the declaration of the expert in the present case was limited to offering an opinion on a conclusion of law. We do not rely upon expert opinion testimony to establish the legal question of duty, but "we perceive no reason to preclude a trial court from receiving expert testimony on the customary practices in an arena of esoteric activity for purposes of weighing whether the inherent risks of the activity were increased by the defendant's conduct." (*Huffman v. City of Poway* (2000) 84 Cal.App.4th 975, 995, fn. 23 [101 Cal.Rptr.2d 325]; see also *American Golf*

---

[5] Indeed, plaintiff's conduct was largely foreseeable. She presented evidence that McKay was a school district employee who had primary authority over the school's swim teams, that he was in charge of the swim meet, that plaintiff had conveyed to him both how upset she was about being required to dive at the meet and that she felt unprepared, that he previously had asked more experienced girls to provide instruction for the novices, and that she could see him while she performed the practice dives.

*Corp. v. Superior Court* (2000) 79 Cal.App.4th 30, 37 [93 Cal.Rptr.2d 683]; *Staten v. Superior Court* (1996) 45 Cal.App.4th 1628, 1635–1637 [53 Cal.Rptr.2d 657].)

III

Keeping in mind that ultimately it will be plaintiff's obligation to establish the elements of her cause of action before the trier of fact by a preponderance of the evidence, we believe that triable issues of material fact exist regarding the question whether coach McKay breached a duty of care owed to plaintiff, thereby causing her injury, by engaging in conduct that was reckless in that it was totally outside the range of ordinary activity involved in teaching or coaching the sport of competitive swimming.

For the foregoing reasons, the judgment of the Court of Appeal is reversed and the matter is remanded for further proceedings consistent with this opinion.

Baxter, J., Chin, J., Brown, J., and Moreno, J., concurred.

**WERDEGAR, J.,** Concurring.—Instructors and coaches of active sports must, as an essential part of their jobs, encourage and direct students to learn new and more difficult maneuvers and to perform already learned skills in more stringent competitive circumstances, a learning process that carries inherent risks of physical injury. In learning active sports and in athletic competition the risk of injury is ever present; instructors must frequently exercise their individual, subjective judgment in deciding whether a student is ready to attempt a more dangerous skill or to face tougher competition; and when an injury occurs, especially an injury to a young person, the jury may be tempted to "second-guess [the] instructor's assessment" (*Kane v. National Ski Patrol System, Inc.* (2001) 88 Cal.App.4th 204, 214 [105 Cal.Rptr.2d 600]). For these reasons, I agree with the majority that application of ordinary negligence standards to sports instruction threatens to severely chill both institutions' maintenance of, and individual teachers' participation in, such instructional programs.

I therefore agree with the majority that an instructor should be liable for a student's injury in the course of learning a sport only if the instructor's conduct is found to have been " 'totally outside the range of the ordinary activity' [*Knight v. Jewett* (1992) 3 Cal.4th 296, 320 [11 Cal.Rptr.2d 2, 834 P.2d 696] (*Knight*)] involved in teaching or coaching the sport." (Maj. opn., *ante*, at p. 996.) Although the majority also adopts *Knight*'s label of such conduct as "reckless" (*ibid.*), I do not understand our standard, at least in the instructional context, to be equivalent to recklessness as it is sometimes

understood, i.e., as the "wilful or wanton misconduct" shown when an actor has " 'intentionally done an act of an unreasonable character in disregard of a risk known to him or so obvious that he must be taken to have been aware of it, and so great as to make it highly probable that harm would follow.' (Prosser, Law of Torts (4th ed. 1971) § 34, p. 185.)" (*Morgan v. Southern Pacific Trans. Co.* (1974) 37 Cal.App.3d 1006, 1011 [112 Cal.Rptr. 695]; see also *Delaney v. Baker* (1999) 20 Cal.4th 23, 31 [82 Cal.Rptr.2d 610, 971 P.2d 986] [recklessness "has been described as a 'deliberate disregard' of the 'high degree of probability' that an injury will occur"].) Rather, I believe a coach or instructor departs from the range of ordinary instructional activities, increasing the risks of injury beyond those inherent in teaching a sport, and is therefore subject to liability, when his or her conduct constitutes a gross or extreme departure from the instructional norms. In this, I agree with counsel for amicus curiae California Ski Industry Association, who, at oral argument, suggested the proper standard would look to an "extreme departure from standards of ordinary care."

We started our duty analysis in *Knight* from the indubitably true proposition that "defendants generally have no legal duty to eliminate . . . risks inherent in the sport" but "do have a duty to use due care not to increase the risks . . . over and above those inherent in the sport." (*Knight, supra,* 3 Cal.4th at pp. 315–316.) We then reasoned that in active sports "a participant's normal energetic conduct often includes accidentally careless behavior" (*id.* at p. 318), which is for that reason "treated as an 'inherent risk' of a sport" (*id.* at p. 316), and that to allow liability to be imposed for such coparticipant negligence would alter the nature of the sport and thus chill "vigorous participation in such sporting events" (*id.* at p. 318). *Knight*'s conclusion as to the particular duty applicable was limited to coparticipants; we noted expressly that the duty of care may vary with "the role of the defendant whose conduct is at issue." (*Ibid.*)

Using analogous reasoning here, I believe we must recognize a somewhat greater duty on the part of instructors, especially teachers and coaches of minor students, than the duty participants in a sport owe one another. A school football *coach*, while far from being the insurer of students' safety, is also very differently situated in knowledge, training, experience, and responsibilities from the casual football *player* whose duty we considered in *Knight*. It might be said that a participant's extreme departure from the degree of care shown by an ordinarily prudent person is an inherent risk of certain vigorous competitive sports, for in the heat of a game or the excitement of a race a contestant may lose sight of virtually everything except his or her goal. But a coach or instructor stands somewhat apart from the fray; the coach's role includes observing and directing the competition, and he or she is expected to keep a cooler head than the competitors themselves. When the instructor or coach is a schoolteacher, moreover, the safety of the minor students will

usually be a primary consideration.[1] Society expects—legitimately, in my view—more from instructors and coaches than merely that they will refrain from harming a student intentionally or with wanton disregard for safety. An instructor's gross or extreme lack of care for student safety is not an inherent risk of school athletics programs.

Finally, I believe a standard akin to gross negligence will provide sufficient protection against unfair second-guessing of the instructor's judgment and, therefore, will not unduly chill participation in sports instruction. The Legislature has, in a wide variety of contexts, considered a rule of qualified immunity, under which liability may be imposed only for gross negligence, sufficient to protect participants in, and sponsors of, socially useful enterprises against unfair liability. Such qualified immunity applies, for example, to liability of a public entity or employee for hazardous recreational activity on public property;[2] to physicians, nurses and others giving medical care at the scene of an emergency;[3] to volunteers and aid donors in enterprises of public benefit;[4] and to various other projects, public and private, deemed important to Californians' health and safety.[5] These statutes reflect the sound legislative judgment that, under a gross negligence standard, meritless suits will typically be disposed of by summary judgment; that when a case goes to trial the jury, instructed on this standard, will be less likely to confuse injury with fault; and that verdicts reflecting such confusion will be more readily reversed, whether by the trial or appellate court, than under an ordinary negligence standard. The same is true of suits arising from school sports injuries. We have no reason to believe athletic instructors and coaches, or the institutions that employ them, will, by and large, be deterred from offering

---

[1] Public schoolteachers, in particular, owe students a duty of care arising in part from their statutory duty of supervision. (Ed. Code, § 44807; *Dailey v. Los Angeles Unified School Dist.* (1970) 2 Cal.3d 741, 747 [87 Cal.Rptr. 376, 470 P.2d 360].)

[2] Government Code section 831.7, subdivision (c)(5).

[3] E.g., Education Code section 76407, subdivision (b) (physician offering voluntary medical assistance to participant at community college athletic event); Civil Code sections 1714.2, subdivision (b) (person rendering cardiopulmonary resuscitation at scene of emergency), 1714.21, subdivision (f) (volunteer rendering emergency care with automated external defibrillator); Health and Safety Code section 1799.106 (emergency medical technician, firefighter or law enforcement officer rendering emergency medical services at scene of emergency); Business and Professions Code sections 2727.5 (registered nurse rendering care, outside course of employment, at scene of emergency), 3706 (same as to respiratory therapist), 4826.1 (veterinarian rendering emergency treatment to animal at scene of accident).

[4] E.g., Corporations Code section 5239, subdivision (a)(3) (volunteer director or officer of nonprofit public benefit corporation); Welfare and Institutions Code section 9543, subdivision (e) (donor of food to "Brown Bag" program for low-income seniors).

[5] E.g., Health and Safety Code sections 1596.643, subdivision (b) (employees of state agency operating child care services hotline), 25400, subdivision (b) (public entity or employee abating hazardous substance spill or discharge), 120455 (person administering vaccine to minor).

sports instruction with the protection of a gross negligence qualified immunity. School sports are certainly valuable, but I submit they are not more important than, for example, emergency cardiac care, volunteer service with nonprofits, donation to low-income food services, or administration of vaccines against childhood diseases, and school sports require no greater immunity than the law grants such highly useful activities.

Like the majority, I conclude the record here presents a triable issue of fact as to whether the individual defendant's conduct "was totally outside the range of ordinary activity involved in teaching or coaching the sport of competitive swimming." (Maj. opn., *ante*, at p. 1018.) Plaintiff's evidence, if believed, tends to show she received virtually no instruction on the shallow-water racing dive, a maneuver carrying a relatively high risk of serious injury, despite the existence of an authoritative protocol, regarded as essential to student safety, for teaching this skill. Directing a student to perform such a skill in competition under these circumstances would be an extreme departure from the norms of swim instruction, and thus completely outside the ordinary range of teaching the sport.

For the above reasons, I concur in the judgment.

**KENNARD, J.,** Concurring and Dissenting.—More than a decade ago in *Knight v. Jewett* (1992) 3 Cal.4th 296 [11 Cal.Rptr.2d 2, 834 P.2d 696] (*Knight*) and *Ford v. Gouin* (1992) 3 Cal.4th 339 [11 Cal.Rptr.2d 30, 834 P.2d 724] (*Ford*) a plurality of three justices of this seven-member court concluded that participants in active sports have no duty to act with the ordinary care expected of a reasonable person to prevent injury to coparticipants. I disagreed with that position in *Knight* and *Ford* (*Knight, supra,* at pp. 324–338 (dis. opn. of Kennard, J.); *Ford, supra,* at pp. 351–364 (conc. opn. of Kennard, J.), and have continued to do so (see *Cheong v. Antablin* (1997) 16 Cal.4th 1063, 1075 [68 Cal.Rptr.2d 859, 946 P.2d 817] (conc. opn. of Kennard, J.) [decrying the "no duty" approach as "tearing at the fabric of tort law"]). In this case, the majority extends the no duty rule to a coach of a high school athletic team, concluding that the coach's alleged failure to train and supervise a young student athlete to dive into a shallow pool, resulting in her serious injury, is of no legal consequence. In the majority's view, a coach of teenage athletes need have little concern for their physical safety.

I disagree. I would hold high school coaches to the general standard of ordinary care. Concluding that the coach's conduct here may have passed beyond negligence into the zone of recklessness, the majority reverses the Court of Appeal's judgment. I join in the reversal of the Court of Appeal's judgment, but for different reasons. I would require the injured plaintiff to establish only negligence, not recklessness.

I

Pertinent here are two decisions of this court involving personal injury actions brought by sports participants against coparticipants, *Knight, supra,* 3 Cal.4th 296, and *Ford, supra,* 3 Cal.4th 339. In *Knight,* the plaintiff sued a member of the opposing team for injury suffered during a touch football game; the plaintiff in *Ford,* while waterskiing, collided with a tree and then sued the ski boat driver. In each case, the defendant asserted that the plaintiff's knowing and voluntary participation in the sport barred recovery under the doctrine of assumption of risk, an affirmative defense recognizing that "a person generally should be required to accept responsibility for the normal consequences of a freely chosen course of conduct." (*Knight, supra,* at p. 332 (dis. opn. of Kennard, J.); *Ford, supra,* at p. 361 (conc. opn. of Kennard, J.).) In both cases, a three-justice plurality of this court abolished assumption of risk as an affirmative defense to a negligence action. (*Knight, supra,* at p. 320; *Ford, supra,* at pp. 344–345 (lead opn. of Arabian, J.); *id.* at p. 364 (conc. and dis. opn. of George, J., joined by Lucas, C. J.).) Under that view, assumption of risk is an aspect of the duty of care that one person owes to another, and when a participant in an active sport seeks recovery from a coparticipant, it abrogates the defendant's ordinary duty of care. As the plurality phrased it in *Knight, supra,* at page 320, "a participant in an active sport breaches a legal duty of care to other participants—i.e., engages in conduct that properly may subject him or her to financial liability—only if the participant intentionally injures another player or engages in conduct that is so reckless as to be totally outside the range of the ordinary activity involved in the sport." (Fn. omitted.)

I disagreed with the plurality's view that assumption of risk is an aspect of duty. (*Knight, supra,* 3 Cal.4th at pp. 324–338 (dis. opn. of Kennard, J.); *Ford, supra,* 3 Cal.4th at pp. 351–364 (conc. opn. of Kennard, J.).) I explained that by "recast[ing] the analysis of implied assumption of risk from a subjective evaluation of what a particular plaintiff knew and appreciated about the encountered risk into a determination of the presence or absence of duty legally imposed on the defendant," the plurality "transform[ed] an affirmative defense into an element of the plaintiff's negligence action," thereby "abolish[ing] the [assumption of risk] defense without acknowledging that it [was] doing so." (*Knight, supra,* at p. 324 (dis. opn. of Kennard, J.).)

But even assuming that the only duty of care that participants in active sports owe each other is to avoid intentional injury or recklessness, that standard should not govern the conduct of a professional coach entrusted to teach novice athletes.

## II

The majority holds that a severely injured 14-year-old student athlete cannot recover for the negligence of her junior varsity swim team coach who allegedly failed to train her to perform a dangerous shallow-water dive before requiring her to execute the dive in a competitive swim meet.

Negligence consists of "creat[ing] or fail[ing] to avoid unreasonable risks of foreseeable harm to others." (1 Dobbs, Torts (2001) § 166, p. 275.) That rule is reflected in Civil Code section 1714, which makes every person responsible for "an injury occasioned to another by his or her want of ordinary care . . . ." In general, the standard of ordinary care is satisfied when the conduct conforms to that of "a reasonably prudent person under like circumstances." (*Ramirez v. Plough, Inc.* (1993) 6 Cal.4th 539, 546 [25 Cal.Rptr.2d 97, 863 P.2d 167].) Thus, defendant coach in this case should be held liable if, in teaching plaintiff the requisite skills of competitive swimming and in supervising her progress, the coach's conduct fell short of that of a *reasonable* coach of student athletes in similar circumstances.

The majority, however, considers that standard of care too onerous in this case. It holds that the coach is not liable if his conduct merely created an unreasonable risk of foreseeable harm. According to the majority, plaintiff student must prove that the coach acted intentionally to cause her injury, or that he acted recklessly through conduct " 'totally outside the range of the ordinary activity' [citation] involved in teaching or coaching" the sport of junior varsity competitive swimming. (Maj. opn, *ante,* at p. 996.) In doing so, the majority adopts the same standard for a professional coach of *novice teenage athletes* that the *Knight* and *Ford* plurality found appropriate for *participants* in active sports. Not taken into account by the majority is the significant difference between the two groups. Persons participating in active sports have to expect that a coparticipant may play too roughly and thus cause injury. By contrast, coaches of student athletes teach them the skills necessary to perform their sport of choice safely and effectively. Because student athletes, particularly minors, often consider their coach a mentor or role model, they trust the coach not to carelessly and needlessly expose them to injury. The majority's decision puts an end to that trust: Coaches are under no legal obligation to use reasonable care in training their students how best to perform a sport without incurring personal injury.

The concurring opinion agrees with the majority that a coach incurs liability to a student athlete only for conduct " ' "totally outside the range" ' " of ordinary coaching activity. (Conc. opn. of Werdegar, J., *ante,* at p. 1018.) But it objects to the majority's labeling such conduct " 'reckless' " (*ibid.*), preferring to call it "gross negligence." (*Id.* at p. 1020.) Whatever one

chooses to call it, the standard the majority imposes is dangerously lax; it puts concern for the physical safety of children far down on a secondary school coach's list of priorities.

The majority asserts that requiring coaches to act reasonably when instructing young students would "improperly chill[]" their efforts "to challenge or 'push' a student or athlete to advance in his or her skill level and to undertake more difficult tasks." (Maj. opn., *ante*, at p. 996.) Not so. Because participation in active sports always entails some risk of harm, the traditional negligence standard imposes liability on an athletic coach only for conduct that exposes players to an *"unreasonable* risk" of such harm. (1 Dobbs, Torts, *supra*, § 166, p. 275.) This standard of negligence requires no more of coaches than that they conform their conduct to that of "a reasonably prudent person under like circumstances." (*Ramirez v. Plough, Inc., supra*, 6 Cal.4th at p. 546.) Thus, contrary to the majority's view, applying the negligence standard here would leave coaches free to challenge or push their students to advance their skills level as long as they do so without exposing the student athletes to an unreasonable risk of harm.

High school shop instructors who teach students how to operate a power saw or repair a car, and chemistry teachers in their laboratories, are held to a standard of ordinary negligence. Why should a different standard apply to an instructor who teaches students competitive swimming? According to the majority, a different standard is called for because a coach must "challenge or 'push' a student or athlete to advance in his or her skill level and to undertake more difficult tasks." (Maj. opn., *ante*, at p. 996.) Yet any teacher, no matter what the subject matter, challenges students to perform with ever greater skill and to undertake progressively harder tasks. There is no logical basis for treating coaches differently.

### III

The majority concludes that summary judgment was improperly granted for defendant coach because triable issues of fact exist as to whether he acted recklessly such that his conduct was totally outside the range of the ordinary activity of a coach of junior varsity competitive swimming. In my view, plaintiff's allegations that defendant did not adequately prepare her to execute a dive in shallow water before directing her to perform the dive at a swim competition states a cause of action for negligence, not recklessness. But I agree with the majority in reversing the Court of Appeal, which upheld the trial court's grant of summary judgment.

These are my reasons for reversing the Court of Appeal: The trial court granted summary judgment on the ground that defendant coach had no duty

to avoid negligent conduct in instructing and supervising plaintiff. Because in my view a professional coach of high school students has a duty to act reasonably in instructing and supervising them, and no evidence before the trial court established that plaintiff voluntarily assumed the risk of her injury, defendant was not entitled to summary judgment. Accordingly, I would reverse the Court of Appeal and remand this case for trial on plaintiff's negligence action.