Filed 11/19/14

<u>CERTIFIED</u> <u>FOR</u> <u>PUBLICATION</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Nevada)

----

| | |
|---|---|
| CHRISTINA ELLIOTT, | |
| Plaintiff and Appellant, | C072129 |
| v. | (Super. Ct. No. 77371) |
| GEICO INDEMNITY COMPANY, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Nevada County, Sean P. Dowling, Judge.  Affirmed.

LAW OFFICES OF SCOTT A. BONZELL and Scott A. Bonzell for Plaintiff and Appellant.

GILBERT, KELLY, CROWLEY & JENNETT, Timothy W. Kenna and John J. Moura for Defendant and Respondent.


Christina Elliott appeals from a judgment dismissing her lawsuit against Geico Indemnity Company (Geico), which was entered after the trial court granted Geico's motion for summary judgment.  Elliott's husband was killed when his motorcycle was struck by a truck driven by a drunk driver, Lesa Shaffer, who was returning home from

1

her job at Peterson's Corner, a restaurant and bar in Nevada City. The trial court concluded Geico was not required to pay underinsured motorist benefits under a motorcycle insurance policy issued to Elliott and her husband (Geico policy) because Elliott recovered more than the $100,000 underinsured motorist coverage limits in settlement of a wrongful death action brought against Shaffer and the owners of the restaurant (Shaffer's insurer paid $15,000 and the owners' general liability insurer paid $250,000).

We agree and affirm. As we explain, the Geico policy unambiguously allows Geico to deduct from the underinsured motorist coverage limits "the amount paid to the *insured* by or for any person or organization that may be held legally liable for the injury." In addition to the $15,000 paid to Elliott for Shaffer's liability, $250,000 was paid by the restaurant owners' general liability insurer in settlement of Elliott's claim that the owners were also liable for her husband's death because Shaffer consumed alcohol in the course of her employment prior to the accident. Because $265,000 was paid to Elliott in settlement of her claims that both Shaffer and the owners may be held legally liable for the injury, Geico properly deducted this amount from the underinsured motorist coverage limits.

## FACTS

The facts are undisputed. Elliott's husband was riding his motorcycle on State Route 49 in Nevada County when it was struck by an oncoming truck that had crossed the center line and entered into his lane of travel. The driver of the truck, Shaffer, was returning home from her job at Peterson's Corner. She was intoxicated.

Shaffer's insurance policy had a bodily injury limit of $15,000 per person, while the Geico policy had an underinsured motorist coverage limit of $100,000 per person. However, in settlement of a wrongful death action brought against both Shaffer and the owners of Peterson's Corner, Elliott recovered not only the $15,000 policy limit from Shaffer's insurer, but also $250,000 from the owners' general liability insurance carrier.

2

Following the settlement, Elliott submitted a claim to Geico for $85,000 in underinsured motorist benefits ($100,000 underinsured motorist coverage limits minus $15,000 recovered from Shaffer's insurer). Her interpretation of the policy's underinsured motorist coverage was not based on the language of the policy itself, but rather on a document she received along with the policy purporting to explain the uninsured motorist and underinsured motorist coverage provided in the policy. (Abbreviations "UM" (uninsured motorist) and "UND" (underinsured motorist) may be used *post*.) Under the heading, "UNDERINSURED MOTORIST COVERAGE EXPLAINED," the document states: "The underinsured motorist portion of your UM & UND coverage pays the **difference** between your UM & UND limits and the at fault driver's Bodily Injury limits based on the amount of your injuries. For example: If your UM & UND limits are $100,000/$300,000, the at fault driver's Bodily Injury limits are $25,000/$50,000, and you sustain injuries totaling $50,000, we will pay $25,000 under your UM & UND coverage (the difference between your injuries and the amount you recover from the at fault driver). However, if you carry $25,000/$50,000 UM & UND coverage, there would be *no difference* between the two and no payment would be due even though your injuries exceed that amount." Geico denied Elliott's claim on the basis her total recovery in the wrongful death action was $265,000 and the terms of the actual policy allowed Geico to deduct from the underinsured motorist coverage limits "the amount paid to the *insured* by or for any person or organization that may be held legally liable for the injury."

Elliott sued Geico for breach of contract and breach of the covenant of good faith and fair dealing. She alleged in the operative complaint that the document containing the explanation of underinsured motorist coverage (UM/UND form) is part of the Geico policy, Geico breached its obligations under the policy by denying such coverage, and Geico did so in violation of the implied covenant of good faith and fair dealing.

Geico moved for summary judgment. Geico argued the dispositive policy provision is the following: "When *bodily injury* is caused by one or more motor vehicles under this coverage, our maximum liability for providing Underinsured Motorists coverage shall not exceed the *insured's* Underinsured Motorists coverage limits, less the amount paid to the *insured* by or for any person or organization that may be held legally liable for the injury." Geico explained this provision is taken, nearly word for word, from Insurance Code section 11580.2, subdivision (p)(4),[1] which has been held to require underinsured motorist benefits be reduced, not only by the amount recovered from the negligent driver's insurer, but also by the amount recovered from a third-party tortfeasor. (See *Mercury Ins. Co. v. Vanwanseele-Walker* (1996) 41 Cal.App.4th 1093, 1101-1102 (*Vanwanseele-Walker*).) Geico also argued Elliott had no reasonable expectation of coverage under the policy since the policy itself is unambiguous and any potential ambiguity created by the example provided in the UM/UND form must be resolved by the terms of the policy. Finally, because the policy uses the statutory language found in section 11580.2, subdivision (p)(4), Geico argued the policy must be construed in accordance with the statute and no reasonable insured would expect coverage above that required by the statute.

Elliott opposed the motion. She argued: (1) the rights and obligations of the parties must be determined by the terms of the Geico policy, and not the Insurance Code; (2) the UM/UND form is part of the Geico policy; (3) the terms of the UM/UND form provide coverage; (4) the Geico policy should be interpreted in favor of a finding of

---

[1]    Undesignated statutory references are to the Insurance Code. Section 11580.2, subdivision (p)(4), provides: "When bodily injury is caused by one or more motor vehicles, whether insured, underinsured, or uninsured, the maximum liability of the insurer providing the underinsured motorist coverage shall not exceed the insured's underinsured motorist coverage limits, less the amount paid to the insured by or for any person or organization that may be held legally liable for the injury."

4

coverage; (5) her reasonable expectation of coverage under the UM/UND form must be protected; (6) because the Geico policy is an adhesion contract, it is subject to the closest possible scrutiny; (7) the conflicting terms of the UM/UND form and the "boilerplate section" allowing for a greater offset against the underinsured motorist coverage limits creates an ambiguity that must be resolved in favor of a finding of coverage; (8) Geico must be held to its own explanation of underinsured motorist coverage contained in the UM/UND form; and (9) *Vanwanseele-Walker*, *supra*, 41 Cal.App.4th 1093 and other cases relied upon by Geico in its motion are not controlling.

The trial court granted the motion, explaining: "[T]he primary question before this court is whether or not the document which includes the 'Underinsured Motorist Coverage Explained (UND)' section is part of the policy. Plaintiff contends that it is part of the policy because it was included with the policy documents and includes the policy number. [¶] However, the court finds that such document is not part of the policy. Many of the documents provided to plaintiff with the policy included the policy number: the 'Safe-Riding Cyclist' letter, the proof of insurance cards, a community service statement, a consumer information document and a privacy notice. If the court were to accept plaintiff's argument, then all of these documents would be considered part of the policy. [¶] Furthermore, there is only one document entitled 'California Motorcycle Insurance Policy,' and it consists of 20 pages. Page 15 of the policy, under the heading 'Limits of Liability,' specifically provides that the 'amount payable under this coverage will be reduced by all amounts . . . paid by or for all persons or organizations liable for the injury.' This provision is unambiguous. An insured's reasonable expectation of coverage can only be examined where there is an ambiguity in the actual policy. [Citation.] Because there is no ambiguity, plaintiff's expectations of coverage are irrelevant. Moreover, even if there were any ambiguity, as stated in the case of [*Hervey v. Mercury Casualty Co.* (2010) 185 Cal.App.4th 954], any ambiguity can be resolved by the terms of the policy itself. [¶] Further, this provision conforms with [section]

5

11580.2[, subdivision ](p)(4). As held by the [Court of Appeal for the Fourth Appellate District] in the case of [*Vanwanseele-Walker*, *supra*, 41 Cal.App.4th 1093], all amounts received [from] persons potentially liable for the injury operate to offset the underinsured-motorist limits."

DISCUSSION

I

*Standard of Review*

"A defendant's motion for summary judgment should be granted if no triable issue exists as to any material fact and the defendant is entitled to a judgment as a matter of law. [Citation.] The burden of persuasion remains with the party moving for summary judgment. [Citation.]" (*Kahn v. East Side Union High School Dist.* (2003) 31 Cal.4th 990, 1002-1003 (*Kahn*); Code Civ. Proc., § 437c, subd. (c).) On appeal from the entry of summary judgment, "[w]e review the record and the determination of the trial court de novo." (*Kahn*, *supra*, 31 Cal.4th at p. 1003.) Here, the operative facts are undisputed and liability depends solely on the correct interpretation of the Geico policy, a question of law subject to de novo review on appeal. (*Hervey v. Mercury Casualty Co.* (2010) 185 Cal.App.4th 954, 962-963 (*Hervey*) ["the interpretation of a contract, including whether an insurance policy is ambiguous or whether an exclusion or limitation is sufficiently conspicuous, plain, and clear, is a question of law"].)

II

*Interpretation of Insurance Policies*

"Ordinary rules of contract interpretation apply to insurance policies. [Citation.] 'Under statutory rules of contract interpretation, the mutual intention of the parties at the time the contract is formed governs interpretation. [Citations.] Such intent is to be inferred, if possible, solely from the written provisions of the contract. [Citation.] The "clear and explicit" meaning of these provisions, interpreted in their "ordinary and popular sense," unless "used by the parties in a technical sense or a special meaning is

6

given to them by usage" [citation], controls judicial interpretation. [Citation.] Thus, if the meaning a layperson would ascribe to contract language is not ambiguous, we apply that meaning. [Citations.] [¶] . . . In the insurance context, we generally resolve ambiguities in favor of coverage. [Citations.] Similarly, we generally interpret the coverage clauses of insurance policies broadly, protecting the objectively reasonable expectations of the insured. [Citations.] These rules stem from the fact that the insurer typically drafts policy language, leaving the insured little or no meaningful opportunity or ability to bargain for modifications. [Citations.] Because the insurer writes the policy, it is held "responsible" for ambiguous policy language, which is therefore construed in favor of coverage.' " (*Hervey*, *supra*, 185 Cal.App.4th at p. 961, quoting *AIU Ins. Co. v. Superior Court* (1990) 51 Cal.3d 807, 821-822.)

However, "[a]lthough it is generally true that an ambiguity in an insurance policy is construed against the insurer who causes the ambiguity, where the language is that of the Legislature, this principle does not apply. [Citation.] In such situations, 'the statute [and, hence, the insurance policy provision in conformity therewith] must be construed to implement the intent of the Legislature and should not be construed strictly against the insurer. . . .' " (*State Farm Mut. Auto. Ins. Co. v. Messinger* (1991) 232 Cal.App.3d 508, 519, quoting *Prudential-LMI Com. Insurance v. Superior Court* (1990) 51 Cal.3d 674, 684.)

### III

### *Analysis of Elliott's Claims on Appeal*

With the foregoing legal principles in mind, we now address and reject each of Elliott's claims on appeal. As she did below, Elliott asserts: (1) the UM/UND form is part of the Geico policy; (2) the conflicting terms of the UM/UND form and the policy provision allowing for a greater offset against the underinsured motorist coverage limits creates an ambiguity that must be resolved in favor of a finding of coverage; (3) the meaning of the Geico policy must be determined in accordance with Elliott's reasonable

7

expectation of coverage, with all doubts resolved against Geico; and (4) as an adhesion contract, the Geico policy must be construed in Elliott's favor because the provision allowing the challenged offset is not conspicuous, plain, and clear.

## A.

### *The UM/UND Form Is Not Part of the Geico Policy*

We first reject Elliott's claim the UM/UND form is part of the Geico policy. The 20-page policy includes the following declaration: "By accepting this policy, you agree that: [¶] . . . [¶] c) this policy, along with the application and Declaration sheet, embodies all agreements relating to this insurance." The two-page declaration sheet lists a single endorsement and sets forth the coverages, policy limits, and deductibles contained in the policy. The endorsement listed on the declaration sheet is found on a single page immediately following the 20-page policy and amends the policy to include towing coverage. By accepting the policy, Elliott agreed these documents, along with her application, would constitute the entirety of her contract with Geico relating to the subject insurance.

The UM/UND form, not one of the documents listed in the policy as part of the insurance contract, was provided by Geico to comply with section 11580.2, subdivision (a), which states in relevant part: "No policy of bodily injury liability insurance covering liability arising out of the ownership, maintenance, or use of any motor vehicle, . . . shall be issued or delivered in this state to the owner or operator of a motor vehicle, or shall be issued or delivered by any insurer licensed in this state upon any motor vehicle then principally used or principally garaged in this state, unless the policy contains, or has added to it by endorsement, a provision with [uninsured motorist] coverage limits at least equal to the limits specified in subdivision (m)[2] and in no case less than the financial

---

[2]     Subdivision (m) of this section states: "Coverage provided under an uninsured motorist endorsement or coverage shall be offered with coverage limits equal to the limits

8

responsibility requirements specified in Section 16056 of the Vehicle Code[3] insuring the insured, the insured's heirs or legal representative for all sums within the limits that he, she, or they, as the case may be, shall be legally entitled to recover as damages for bodily injury or wrongful death from the owner or operator of an uninsured motor vehicle. The insurer and any named insured, prior to or subsequent to the issuance or renewal of a policy, may, *by agreement in writing*, in the form specified in paragraph (2) or paragraph (3), (1) delete the provision covering damage caused by an uninsured motor vehicle completely, or (2) delete the coverage when a motor vehicle is operated by a natural person or persons designated by name, or (3) agree to provide the coverage in an amount less than that required by subdivision (m) but not less than the financial responsibility requirements specified in Section 16056 of the Vehicle Code." (§ 11580.2, subd. (a)(1), italics added.)

Paragraphs (2) and (3) of subdivision (a) set forth the language required to be included in the agreement specified in paragraph (1). For example, the agreement to delete the provision covering damage caused by an uninsured motor vehicle must state: " 'The California Insurance Code requires an insurer to provide uninsured motorists coverage in each bodily injury liability insurance policy it issues covering liability arising

---

of liability for bodily injury in the underlying policy of insurance, but shall not be required to be offered with limits in excess of the following amounts: [¶] (1) A limit of thirty thousand dollars ($30,000) because of bodily injury to or death of one person in any one accident. [¶] (2) Subject to the limit for one person set forth in paragraph (1), a limit of sixty thousand dollars ($60,000) because of bodily injury to or death of two or more persons in any one accident."

3      Vehicle Code section 16056, subdivision (a), provides in relevant part: "No policy or bond shall be effective . . . unless the policy or bond is subject, if the accident has resulted in bodily injury or death, to a limit, exclusive of interest and costs, of not less than fifteen thousand dollars ($15,000) because of bodily injury to or death of one person in any one accident and, subject to that limit for one person, to a limit of not less than thirty thousand dollars ($30,000) because of bodily injury to or death of two or more persons in any one accident . . . ."

out of the ownership, maintenance, or use of a motor vehicle. Those provisions also permit the insurer and the applicant to delete the coverage completely or to delete the coverage when a motor vehicle is operated by a natural person or persons designated by name. Uninsured motorists coverage insures the insured, his or her heirs, or legal representatives for all sums within the limits established by law, that the person or persons are legally entitled to recover as damages for bodily injury, including any resulting sickness, disease, or death, to the insured from the owner or operator of an uninsured motor vehicle not owned or operated by the insured or a resident of the same household. An uninsured motor vehicle includes an underinsured motor vehicle as defined in subdivision (p) of Section 11580.2 of the Insurance Code.' " (§ 11580.2, subd. (a)(2).) The agreement may also contain additional language "not in derogation of or in conflict with the foregoing" statutorily mandated statement. (*Ibid*.)

Subdivision (n) of this section provides in relevant part: "Underinsured motorist coverage shall be offered with limits equal to the limits of liability for the insured's uninsured motorist limits in the underlying policy, and may be offered with limits in excess of the uninsured motorist coverage. For the purposes of this section, uninsured and underinsured motorist coverage shall be offered as a single coverage." (§ 11580.2, subd. (n).)

In accordance with the foregoing provisions, the UM/UND form provided by Geico states: "California law requires insurers to offer Uninsured Motorist Bodily Injury (UM & UND) coverage in limits equal to but not exceeding your Bodily Injury (BI) Liability limits, up to a limit of $30,000/$60,000. You may select a higher limit of UM & UND, up to $100,000/$300,000. You may also reject the coverage entirely or select UM & UND limits less than your BI limits, but not less than the minimum limit of $15,000/$30,000." The form then recommends the insured not reject UM/UND coverage, provides the explanation of UND coverage relied upon by Elliott in this appeal, recites the statutory language required by section 11580.2, subdivision (a)(2) and (3), and

10

provides a place for the insured to make the statutorily authorized decision to delete UM/UND coverage or modify the coverage limits.

It does not appear Elliott made a selection on the UM/UND form, thereby retaining the $100,000/$300,000 UM/UND coverage limits already contained in the policy. As section 11580.2, subdivision (a), makes clear, the UM/UND form is a separate "agreement" that, if executed, deletes or modifies the UM/UND coverage contained in the policy. Because Elliott did not execute the agreement to delete or modify the UM/UND coverage in the policy, the UM/UND form cannot be said to have modified the policy in any way. For the same reason, the form is not part of the Geico policy.

Nevertheless, Elliott argues, "every time the Elliotts or their counsel asked Geico or Geico's counsel for a copy of the policy issued to the Elliotts, Geico produced papers including the [UM/UND form], often with a sworn affidavit of the policy's accuracy." Elliott also relies on the fact that during discovery, Geico asked Elliott to "[a]dmit the genuineness of the policy attached hereto as Exhibit 'A,' " and attached not only the policy, but also the UM/UND form and other documents containing the policy number, including a letter thanking the Elliotts for choosing Geico for their motorcycle insurance needs and an invitation to take advantage of lower insurance rates by completing a motorcycle safety course. Elliott then asked Geico to admit the same set of documents "is a true and correct copy" of the Geico policy, to which Geico responded: "Admit." Elliott further relies on a declaration signed by Geico's counsel and submitted with the motion for summary judgment that also attaches the foregoing documents and states: "Exhibit '1' is a true and correct copy of the [Geico policy]." Elliott does not offer any argument or citation to authority as to the legal effect of the foregoing admissions. However, to the extent Elliott argues we should treat them as a judicial admission that the UM/UND form is part of the Geico policy, she is mistaken. "[J]udicial admissions involve facts, not legal theories or conclusions. [Citations.]" (*Stroud v. Tunzi* (2008) 160

11

Cal.App.4th 377, 384.)  Whether the UM/UND form is part of the Geico policy is a question of law and therefore not subject to judicial admission.

Finally, Elliott argues "common sense" tells us the UM/UND form is part of the Geico policy because it "looks exactly like all the other pages of the Geico policy with which it is shipped -- same type face, same type size, same headline style, and so on. And the lengthy policy number -- 4132-50-28-42 -- is affixed to the bottom of the page." The problem with this argument is two-fold.  First, as the trial court pointed out, the policy number is also affixed to the welcome letter, invitation to complete a motorcycle safety course, and other documents that clearly do not set forth policy terms.  Second, the fact the UM/UND form is typographically similar to the actual policy is consistent with our conclusion it is a separate potential agreement to modify the terms of the policy by deleting or altering UM/UND coverage.  However, as we have explained, no such modification occurred in this case.

We conclude the UM/UND form is not part of the Geico policy.

**B.**

***The Policy's Underinsured Motorist Coverage Provisions Are Not Ambiguous***

We also reject Elliott's claim the Geico policy is ambiguous with respect to whether Geico may deduct from the underinsured motorist coverage limits the amount paid on behalf of the owners of Peterson's Corner in settlement of Elliott's wrongful death case.

Section IV of the Geico policy is titled:  "UNINSURED MOTORIST AND UNDERINSURED MOTORIST COVERAGE  [¶]  Protection For *You* and *Your Passengers* For Injuries Caused By Uninsured/Underinsured and Hit-And-Run Motorists."  The section defines "[*u*]*nderinsured motor vehicle*" to mean "a motor vehicle that is insured under a motor vehicle liability policy, or motorcycle liability insurance policy, self-insured, or for which a cash deposit or bond has been posted to satisfy a financial responsibility law, but insured for an amount that is less than the

12

uninsured motorist limits carried on the motor vehicle of the injured person." Under the heading, "LOSSES WE WILL PAY," the section provides in relevant part: "Under this coverage, we will pay damages for *bodily injury* to an *insured*, caused by accident which the *insured* is legally entitled to recover from the owner or operator of an . . . *underinsured motor vehicle* . . . arising out of the ownership, maintenance or use of that motor vehicle."

Under the heading, "LIMITS OF LIABILITY," after setting forth the coverage limits for " 'each person' " and " 'each occurrence,' " the section provides: "When *bodily injury* is caused by one or more motor vehicles under this coverage, our maximum liability for providing Underinsured Motorists coverage shall not exceed the *insured's* Underinsured Motorists coverage limits, less the amount paid to the *insured* by or for any person or organization that may be held legally liable for the injury." The section then repeats: "The amount payable under this coverage will be reduced by all amounts: [¶] a) paid by or for all persons or organizations liable for the injury . . . ."

The foregoing limitation of liability is taken, nearly word for word, from the Insurance Code. Section 11580.2, subdivision (p)(4), provides: "When bodily injury is caused by one or more motor vehicles, whether insured, underinsured, or uninsured, the maximum liability of the insurer providing the underinsured motorist coverage shall not exceed the insured's underinsured motorist coverage limits, less the amount paid to the insured by or for any person or organization that may be held legally liable for the injury." In *Vanwanseele-Walker*, *supra*, 41 Cal.App.4th 1093, the Court of Appeal for the Fourth Appellate District held this provision requires underinsured motorist benefits be reduced, not only by the amount recovered from the negligent driver's insurer, but also by the amount recovered from a third-party tortfeasor. The court first explained: "If the [negligent driver's bodily injury] coverage limits are lower than the victim's underinsurance policy limits, the insured is entitled, *at most*, to recover the difference between the two." (*Id*. at p. 1101, italics added.) However, "the plain words of the

13

statute" also allow the insurer to deduct from the coverage limits payments made by or for " 'any person or organization that may be held legally liable for the injury.' " (*Ibid*.) Thus, " ' "[a]s the statutory scheme is designed, the underinsured motorist carrier gets a dollar-for-dollar credit for all payments by third party tortfeasors to the insureds, whether the insureds are made whole or not. In other words, a carrier providing underinsured motorist benefits *never* pays the full amount, *only the difference between the policy limits and all contributions by all tortfeasors to all insureds*." ' [Citations.]" (*Id*. at p. 1102.)

Here, Elliott concedes the underinsured motorist benefits to which she is entitled must be reduced by the amount received from Shaffer's insurer. While Elliott disputes the same applies to the amount paid for the owners of Peterson's Corner in settlement of her wrongful death action, she does not directly dispute the owners are persons "that may be held legally liable for the injury." (§ 11580.2, subd. (p)(4).) Indeed, she sued the owners under the doctrine of respondeat superior claiming they were legally liable for the injury because Shaffer drank on the job prior to getting behind the wheel. Thus, under the plain words of both the statute and the Geico policy, Geico's maximum liability "shall not exceed" Elliott's underinsurance coverage limits ($100,000) *less* amounts paid for the owners of Peterson's Corner ($250,000). Since $250,000 is more than $100,000, Elliott is not entitled to any payment from Geico. (See *Vanwanseele-Walker*, *supra*, 41 Cal.App.4th at p. 1101.) And while, as Elliott points out, we are tasked in this appeal with interpreting the Geico policy, not the Insurance Code, where the policy tracks the language of section 11580.2, subdivision (p)(4), and that subdivision plainly allows the offset taken by Geico, we must also conclude the policy is plain and unambiguous with respect to Geico's ability to deduct from the policy limits the amount paid on behalf of the owners of Peterson's Corner.

Elliott argues the policy's underinsured motorist coverage provisions are ambiguous because the UM/UND form's explanation of the coverage and the terms of the policy itself present "a clear dichotomy in the underinsured coverage offered." This

14

argument is premised on the notion the UM/UND form is part of the Geico policy. We have already concluded it is not. Since the UM/UND form is not part of the policy, it is by definition extrinsic evidence. Such evidence is "admissible to interpret an insurance policy if ' "relevant to prove a meaning to which the language of the instrument is reasonably susceptible." ' [Citation.] Although parol evidence may be admissible to determine whether the terms of a contract are ambiguous [citation], it is not admissible if it contradicts a clear and explicit policy provision. [Citation.]" (*Hervey*, *supra*, 185 Cal.App.4th at p. 961.) The explanation of underinsured motorist coverage and example provided by Geico in the UM/UND form is accurate as far as it goes, but does not point out the recovery of such benefits is offset, not only by the amount recovered from the at fault driver, but also by the amount paid by or for any person or organization that may be held legally liable for the injury. To the extent Elliott seeks to use the UM/UND form to prove the Geico policy is reasonably susceptible to her interpretation that the latter offset is unauthorized, the terms of the policy itself are clear and explicit on the point. Indeed, Elliott's argument that the UM/UND form and the policy provision relied upon by Geico present a "clear dichotomy" in the underinsurance coverage provided is a tacit admission that her interpretation of the UM/UND form contradicts the policy terms.

Nor are we persuaded by Elliott's argument that the policy provision relied upon by Geico "is so badly written that any careful reader would be baffled." Elliott misquotes the provision as beginning, " 'when bodily injury is caused by one or more motor vehicles under this *policy*' " (italics added), and argues: "The injury to Greg Elliott was *not* caused by a motor vehicle 'under this policy.' It was caused by the motor vehicle of a drunk driver who had her own policy with a different insurer. Does that mean this coverage doesn't apply here at all?" As previously stated, the actual policy provision begins: "When bodily injury is caused by one or more motor vehicles under this *coverage* . . . ." (Original emphasis removed; italics added.) We are confident a reasonable insured would understand "coverage" to mean uninsured and underinsured

15

motorist coverage provided by section IV of the policy. Elliott further argues: "The provision also states that it allows a reduction in benefits for payments made by 'any person or organization that may be held legally liable for the injury.' That could very sensibly be read as a definition or description of *the at-fault driver*—not the at-fault driver *and* anyone else." Not so. As previously explained, the language, "less the amount paid to the ***insured*** by or for any person or organization that may be held legally liable for the injury" is taken, word for word, from section 11580.2, subdivision (p)(4), and plainly allows an offset for all contributions made by all tortfeasors to all insureds. (*Vanwanseele-Walker*, *supra*, 41 Cal.App.4th at p. 1102.)

The policy provision allowing Geico to deduct from the underinsured motorist policy limits the amount paid by or for any person or organization that may be held legally liable for the injury is not ambiguous.

## C.

### *The Doctrine of Reasonable Expectation of Coverage Does Not Apply*

Elliott next contends we must apply the "firm doctrine" that the meaning of an insurance policy must be determined by the insured's reasonable expectation of coverage, with all doubts resolved against the insurer. She is mistaken. "It is settled in this state that 'the doctrine of reasonable expectation of coverage comes into play *only* where there is an ambiguity in the policy.' [Citation.]" (*Lumbermens Mut. Cas. Co. v. Vaughn* (1988) 199 Cal.App.3d 171, 179; cf. *Producers Dairy Delivery Co. v. Sentry Ins. Co.* (1986) 41 Cal.3d 903, 912.) Having concluded the Geico policy is unambiguous with respect to Geico's ability to deduct from the underinsured motorist coverage limits the amount paid on behalf of the owners of Peterson's Corner in settlement of Elliott's wrongful death case, "we need not delve into [Elliott's] arguments concerning [her] reasonable expectations of [coverage]." (*Helfand v. National Union Fire Ins. Co.* (1992) 10 Cal.App.4th 869, 884.)

16

## D.

### *Independent Tests Applicable to Adhesion Contracts Are Satisfied*

Finally, Elliott argues that because the Geico policy is an adhesion contract, "it is not enough the exclusionary clause [i.e., the policy provision allowing the challenged deduction] could be deemed to be precise. It also must pass muster under two other independent tests. (1) The exclusion must be *conspicuous* and (2) the language of the exclusion must be *plain and clear*. . . . First, the exclusion must be positioned in a place and printed in a form which would attract a reader's attention. Secondly, the substance of the exclusion must be stated in words that convey the proper meaning to persons expected to read the contract." (*Ponder v. Blue Cross of Southern California* (1983) 145 Cal.App.3d 709, 719.)

For the reasons expressed in part III B. of this opinion, we conclude the provision allowing Geico to deduct from the underinsured motorist coverage limits the amount paid by or for any person or organization that may be held legally liable for the injury is sufficiently "plain and clear" to satisfy the latter independent test. We also conclude the provision is sufficiently "conspicuous" to satisfy the former. As Geico describes in its briefing on appeal: "It is in the same section ['SECTION IV ― UNINSURED MOTORIST AND UNDERINSURED MOTORISTS COVERAGE'] as the grant of coverage, in the same font and size, follows the grant of coverage on the same page, and is set out in an outline format. The outline format uses prominent headings in total capital letters, and the five individual subdivisions of the 'LIMITS OF LIABILITY' section are separated by empty lines." In *Hervey*, *supra*, 185 Cal.App.4th 954, the Court of Appeal for the Second Appellate District held an exclusionary provision to be conspicuous where "prominently featured" under a descriptive heading that was "printed in the same boldface type as the other headings of the Policy." (*Id*. at p. 967.) Here, the provision allowing Geico to deduct from the underinsured motorist coverage limits the

17

amount paid by or for any person or organization that may be held legally liable for the injury is no less conspicuous.

## DISPOSITION

The judgment is affirmed.  Geico Indemnity Company shall recover its costs on appeal.  (Cal. Rules of Court, rule 8.278(a).)


                                                      _____HOCH_____, J.


We concur:


_____HULL_____, Acting P. J.


_____DUARTE\_\_, J.

18