Filed 2/9/23  Lincoln Pacific Builders v. Elecnor Belco Electric CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| LINCOLN PACIFIC BUILDERS, INC., <br><br> Plaintiff and Appellant, <br><br> v. <br><br> ELECNOR BELCO ELECTRIC, INC. et al., <br><br> Defendants and Respondents. | B312873 <br><br> (Los Angeles County Super. Ct. No. KC070438) |

APPEAL from judgment of the Superior Court of Los Angeles County, Peter A. Hernandez, Judge.  Affirmed.

Law Office of Mark Ravis & Associates and Mark Ravis for Plaintiff and Appellant.

SMTD Law, Marilyn Klinger; Cohen Seglias Pallas Greenhall & Furman, Edward Seglias, Lane F. Kelman and

Cody M. Wolpert for Defendants and Respondents Elecnor Belco Eletric, Inc. and Roger Devito.

_____

Lincoln Pacific Builders, Inc. (LPB) sued Elecnor Belco Electric, Inc. (Belco) and its attorneys Roger Devito and Bennett W. Root, Jr. for malicious prosecution after successfully defeating Belco's cross-complaint in a breach of contract action initiated by LPB.  The trial court granted motions for summary judgment filed by Belco and Devito and by Root, ruling LPB had failed to produce any evidence creating a triable issue of material fact supporting its claim it had been damaged by the filing and continued prosecution of Belco's cross-complaint.  We affirm.[1]

## FACTUAL AND PROCEDURAL BACKGROUND

1. *The Parties and Their 2013 Agreements*

LPB, founded in 2004, specialized in outside transportation electrical work in Southern California, installing streetlights and traffic signals at intersections and on freeways, primarily as a subcontractor on public works projects.  It was certified as a minority business enterprise and disadvantaged business enterprise (MBE/DBE).

By 2012 LPB was in financial trouble, unable to pay all its suppliers, its union trust fund obligations or payroll taxes.  In early 2013 its chief executive officer, Lincoln Chan, was considering selling the company or its assets.[2]

_____

[1]     LPB has not appealed the judgment entered in favor of Root.  We refer to him only as occasionally necessary for context.

[2]     In its opinion affirming the judgment in favor of LPB in the underlying litigation, our colleagues in Division Eight of this court stated more emphatically, "[LPB] wanted to get out of the business as soon as possible."  (*Lincoln Pacific Builders, Inc. v.*

2

Belco, a subsidiary of Elecnor, S.A., a publicly traded Spanish company,[3] was in the general commercial electric business and wanted to expand into the transportation electrical business.

As alleged in LPB's original complaint for breach of contract, in spring 2013 LPB's directors authorized LPB's purchase by Belco.  As a result of the ensuing negotiations, however, rather than acquiring the entire company outright, Belco entered into a series of four contracts with LPB (one dated June 14, 2013, two made on September 10, 2013, and the fourth on September 12, 2013) to buy LPB's outstanding transportation electrical work contracts, equipment and vehicles.  In the fourth contract LPB assigned to Belco "certain work in progress previously contracted" to LPB, and Belco agreed to pay LPB for transition expenses LPB incurred in relation to that work.  Belco also hired most of LPB's workforce, including senior executives other than Chan.

Belco made payments to LPB on the initial contracts totaling $520,000.  It failed to make the payment due September 15, 2013 and made no additional payments prior to the settlement of LPB's lawsuit for breach of contract.

---

*Elecnor Belco Electric, Inc.* (Aug. 22, 2017, B276956) [nonpub. opn.].)

[3]      Belco is a wholly owned subsidiary of Elecnor, Inc., a wholly owned subsidiary of Elecnor Spain, which, in turn, is a wholly owned subsidiary of Elecnor, S.A., a publicly traded corporation.

2. *The Underlying Litigation*

LPB sued Belco on October 27, 2014 for breach of the three contracts executed in September 2013, alleging in its unverified complaint that Belco owed it a total of $513,668. Belco answered the complaint on December 18, 2014, generally denying the allegations in LPB's complaint and asserting 13 affirmative defenses, including that Belco "possesse[d] legal and equitable rights to offset against Plaintiff and, accordingly, any recovery by Plaintiff must be barred or reduced by the amounts of such rights of offset."

Concurrently with its answer Belco also filed a cross-complaint for breach of oral contract, fraud, breach of fiduciary duty, common counts and breach of written contract. The cross-complaint was based on Belco's allegations that, in addition to the written contracts, the parties made an oral agreement to form a joint enterprise so that Belco could acquire jobs on which LPB had not started to work and take over additional jobs on which LPB had begun to perform but had not completed the work. Belco contended LPB breached their oral joint venture agreement by receiving payments from general contractors that were owed to Belco and breached its fiduciary duty to Belco by not disclosing it had received those payments. (The common counts cause of action sought to recover the sums paid to LPB.) The fraud cause of action was based on Belco's claim LPB misrepresented the jobs Belco would take over had value but, because LPB had advance billed and was paid for work it had not completed, the projects were not profitable. The breach of written contract cause of action alleged LPB had not transferred all the jobs that were the subject of the initial June 2013 agreement.

4

The trial court granted LPB's motion for summary judgment on the cross-complaint on June 29, 2016, ruling the integration clauses in the parties' contracts barred any claim resting on breach of an oral contract relating to matters covered in the written contracts; Belco offered no proof of a joint venture and, thus, no proof that LPB owed Belco any fiduciary duties; the undisputed evidence established Belco had worked on and received the full benefit of the seven jobs assigned in the June 14, 2013 agreement; and quasi-contract claims for unjust enrichment were not properly asserted when express agreements defined the parties' rights. (See *Lincoln Pacific Builders, Inc. v. Elecnor Belco Electric, Inc.* (Aug. 22, 2017, B276956) [nonpub. opn.].)

On August 5, 2016 Belco made a Code of Civil Procedure section 998 offer to compromise, apparently limited to LPB's breach of contract claims, which LPB accepted on August 9, 2016. Pursuant to the terms of their settlement, Belco paid LPB $513,750, the amount LPB asserted was unpaid under the parties' agreements, plus $141,904.07 in interest and $63,814.69 for attorney fees and costs.

Notwithstanding settlement of LPB's affirmative claims, Belco appealed the adverse summary judgment granted by the trial court on its cross-complaint. The court of appeal affirmed the judgment on August 22, 2017. (See *Lincoln Pacific Builders, Inc. v. Elecnor Belco Electric, Inc.*, *supra*, B276956.) Belco paid LPB $11,327.00 in July 2018 for LPB's attorney fees and costs incurred in connection with Belco's appeal.

3. *LPB's Malicious Prosecution Action*

LPB filed the instant action for malicious prosecution on July 5, 2018, naming as defendants in its unverified complaint Belco; Root, who LPB alleged represented Belco in its acquisition

5

of LPB's assets and drafted and filed the cross-complaint; and Devito, who LPB alleged worked as Belco's in-house counsel and advised Root regarding the cross-complaint.[4]  The complaint alleged Belco lacked a factual or legal basis to assert any of the five causes of action in its cross-complaint and had filed the pleading to punish LPB for bringing the breach of contract action and to obtain a negotiating advantage, forcing LPB to abandon its complaint or "agree to a minuscule and unjust settlement." According to LPB, at a mediation session shortly after filing its cross-complaint Belco offered to settle the breach of contract claim for approximately 10 cents on the dollar, taking the position its cross-complaint was so strong it owed LPB nothing.

LPB alleged, on information and belief, that Belco failed to present full and accurate information to Root and Devito and that the attorneys failed to adequately investigate the factual and legal bases for the cross-complaint.

Describing the damages claimed, LPB alleged it was "deprived of the monies due under the contracts due to the initial breach of contract and the subsequent litigation which was unduly prolonged due to litigating the cross-complaint, including an appeal filed by Belco."  As a result, LPB alleged, it "was unable to pay its corporate debts and maintain its good credit, suffered reputational injury, and was unable to restructure and competitively bid for new contracts as a minority subcontractor in the electrical transportation industry.  As a consequence, Lincoln lost profits amounting to millions of dollars."  As made clear in

---

[4]     LPB subsequently modified the basis for its claim against Devito, explaining it was conceded he was involved in Belco's appeal of the order granting summary judgment on the cross-complaint.

6

subsequent proceedings in the trial court, LPB was not seeking recovery of the attorney fees and costs it had incurred in the underlying action, as Belco had already paid LPB for those items.

The trial court denied Belco and Devito's special motion to strike (Code Civ. Proc., § 425.16), and they answered the complaint in July 2019.

4. *The Motions for Summary Judgment*

a. *The moving papers*

Belco and Devito moved for summary judgment or, in the alternative, summary adjudication on November 12, 2020.[5] In their motion Belco and Devito argued LPB's claim of lost profit damages was purely speculative and, in any event, any purported lost profits were not caused by the filing and prosecution of Belco's cross-complaint but by Belco's failure to make timely payments pursuant to the September 2013 agreements or by the suspension of LPB's contractor's license in mid-2013. They also argued LPB had not suffered any injury to its reputation as a result of the cross-complaint. Separately, Devito contended LPB lacked evidence he had acted with malice.

In support of their motion Belco and Devito presented evidence from LPB's financial statements that the company had been largely unsuccessful prior to the sale of all its hard assets in 2013: It had sustained losses in six of its nine years in operation and had generated only minimal profits in the other three years. Additional evidence presented with the motion showed that LPB's contractor's license had been suspended on June 23, 2013 because its statutorily required contractor's bond had been

---

[5] Root separately moved for summary judgment the following day.

7

cancelled—events occurring nearly 18 months before Belco filed its cross-complaint in the underlying action. The license was not reinstated until May 2019. Belco and Devito argued LPB could not bid on work while its license was suspended. Moreover, after the transaction with Belco, LPB had no trucks, equipment or tools, and most of its employees left LPB and began to work for Belco.[6]

As for LPB's claim of reputational damage, Belco and Devito argued LPB's only evidence was Chan's deposition testimony that he "had heard from various sources that Lincoln Pacific had cheated Belco." Chan did not remember when or from whom he had heard that statement and conceded there was no documentation to support his recollection. Chan also testified, "I don't know for a fact if this was true, but my understanding, the original source of those sayings came from Walters [Electric Wholesale]."

    b. *LPB's opposition to the motion*

LPB filed an opposition memorandum with exhibits, including its tax returns from 2005 to 2013 and the mediation brief filed by Belco in the underlying litigation, and declarations from Chan; Erich Engler, an executive with the general contractor on the Exposition Light Rail Project who had experience with LPB as a subcontractor; LPB's counsel, Mark Ravis; and Sergio Pena, a former employee of LPB.

In his declaration Ravis stated he had attended the mediation in the underlying case, during which Belco offered to

---

[6]    In his declaration in opposition to the motion Chan added the fact that in September 2013 LPB relinquished its warehouse lease "to conserve funds and pay down LPB debts." As a result, LPB was no longer eligible for MBE/DBE designation.

settle LPB's contract claims for $75,000 "based on the contention that, as set forth in its [c]ross-complaint, it was owed substantial funds by LPB."

Chan's declaration explained LPB aggressively depreciated assets purchased by the company, which reduced the company's taxable income. He posited that net operating cash flow is a better measure of financial health than reported taxable income. To demonstrate this point, Chan stated that in 2005 LPB had taxable income of $17,000 but more than $73,000 in positive cash flow. He made similar comparisons for taxable income (or loss) and cash flow for the following eight years, which demonstrated his company had positive net operating cash flow in seven of its nine years of operation:

- *2006*: $19,000 taxable income; $306,000 positive cash flow.
- *2007*: $5,000 taxable income; $354,000 positive cash flow.
- *2008*: $28,000 taxable loss; $248,000 positive cash flow.
- *2009*: $54,000 taxable income; $333,000 positive cash flow.
- *2010*: $186,000 taxable loss; $34,000 positive cash flow.
- *2011*: $261,000 taxable loss; $138,000 negative cash flow.
- *2012*: $976,000 taxable loss; $927,000 negative cash flow.
- *2013*: $104,000 taxable loss; hypothetical $431,000 positive cash flow if Belco had not breached its agreements with LPB.

According to Chan, what he referred to as "the Great Recession" hit the public works contracting market in Los Angeles in 2010. As a result, government contracts were not being offered, and payments from government entities slowed down greatly. LPB felt the impact of this economic downturn in 2011, 2012 and 2013.

Chan declared that it was his plan, assuming Belco had timely paid the amounts due under its contracts, to pay off LPB's debts, maintain LPB's contractor license in good standing, lease a warehouse, recertify as a MBE/DBE and pursue contracts with a reduced work force. To that end, Chan met with Engler to discuss LPB obtaining a subcontract on the Crenshaw/LAX Light Rail Project in which Engler was involved and which required work identical to that LPB had performed on the Exposition Light Rail Project. According to Chan, he was advised that LPB would be welcome on the project if it could get its financial situation resolved.

Chan's declaration in opposition to the summary judgment motion did not amplify the claim of reputational damage to LPB, simply repeating he had heard (from an unspecified source) that Walter's Electric Wholesale had been telling people about LPB's fraudulent dealings with Belco. Chan stated, "The source of Walter's comments had to be from Belco."

In his declaration Engler confirmed he met with Chan sometime between 2013 and 2016 and would have welcomed a proposal from LPB, not only because he had been very satisfied with LPB's work on the earlier Exposition Light Rail Project, but also because LPB would have satisfied the new project's requirement to attempt in good faith to work with MBE/DBE subcontractors.

10

Pena declared he left LPB to work with Belco in 2013 but told Chan that year, if LPB was able to financially restructure, he was more than willing to rejoin it.

The bulk of LPB's opposition memorandum addressed matters other than causation and damages—the only issues raised in Belco and Devito's motion. In the five pages of its 29-page memorandum discussing these two points, LPB argued in a single sentence, with no reference to any evidence or citation to legal authority, that to accept the argument LPB suffered no loss as a result of Belco's litigation of its cross-complaint "with the resulting three-year delay in payment of monies due to LPB would require this court to make a factual determination of a material fact which is the province of the jury." The remainder of its argument on damages asserted that future lost profits are a recognized form of damages in California; damages need not be proved with certainty; reasonable methods exist to estimate LPB's lost profits; and the jury would be able to take into account LPB's history of successful acquisition of contracts and its designation as a MBE/DBE, the rebound of the economy and the public works market between 2014 and 2017, and the very real possibility that LPB would have been selected as a subcontractor on the Crenshaw/LAX project.

c. *The reply memorandum and evidentiary objections*

In their reply memorandum in support of the motion, Belco and Devito emphasized that LPB had conceded in its opposition its alleged lost profits were caused by Belco's failure to make the payments due under the parties' agreements (that is, Belco's breach of contract)—damages that began on the date of the first missed payment in September 2013. Because the cross-complaint was not filed for more than a year after that date, Belco and LPB

11

argued, it was factually and legally impossible for the cross-complaint to have caused the lost profits. Belco and LPB then again argued any future profits were wholly speculative, noting, for example, that Engler did not declare that LPB would have been awarded a subcontract, LPB did not identify any specific contracts it lost as a result of Belco's failure to pay and Chan conceded that not every subcontract on which it worked was profitable.

With their reply brief Belco and Devito also submitted evidentiary objections to portions of the declarations submitted with LPB's opposition papers.

### d. *The trial court's order granting the motion*

The court held a joint hearing on the motions filed by Belco and Devito and by Root on March 5, 2021 and took the matters under submission. On March 22, 2021 it issued its written ruling granting the motions.

#### i. *The evidentiary rulings*

The court sustained in part and overruled in part the objections to the declarations of Chan, Ravis and Engler and overruled the objections to Pena's declaration. It gave no reasons for the rulings.

The sustained objections included those directed to Ravis's report of the settlement offer made by Belco during the parties' mediation and his submission of Belco's mediation brief as an exhibit; Chan's descriptions of the impact of the economic downturn ("the Great Recession") on the public works contracting market in Los Angeles; Chan's statement he was informed LPB would be welcomed on the Crenshaw/LAX project if it could get its financial situation resolved; his statements about how LPB would have performed if Belco had made timely payments under

12

the parties' contracts; and Chan's declaration he had heard Walter's Electric Wholesale had made negative comments about LPB's dealings with Belco and the source for Walter's comments "had to be from Belco." The court also sustained the objections to Engler's statements that having LPB on the Crenshaw/LAX project was "certainly possible once LPB resolved the financial and legal issues with Belco" and his "expectation" that, if selected as the subcontractor, LPB would have received on the Crenshaw/LAX project more than the $20 million gross it received on the Exposition Light Rail Project.

ii. *The ruling granting the motions*

Noting that LPB's opposition papers mirrored the arguments it had made when opposing the defendants' earlier, unsuccessful special motions to strike pursuant to Code of Civil Procedure section 425.16, the court stated, at the summary judgment stage, LPB "should have evidentiary support beyond the conclusory statements of ultimate facts contained in the provided declarations." As an example, the court stated LPB's assertion that DBE/MBE status meant it did not have to bid for public works contracts did not support its contention that the cross-complaint caused it harm. To the contrary, the court reasoned, if anything, it supported the conclusion the cross-complaint did not cause damages by limiting LPB's ability to obtain public works contracts.

Similarly, the court found that Engler's declaration did not provide any certainty that LPB would be awarded a subcontract for the Crenshaw/LAX project. "A 'welcoming invite' does not reasonably demonstrate the potential of lost profits." The declaration, the court found, was full of conjecture and speculation. Even when interpreted to draw all reasonable

13

inferences in favor of LPB as the nonmoving party, the court concluded, the declaration was not sufficient to support the claim that filing and continuing to prosecute the cross-complaint caused LPB to lose this contract.

Finally, the court rejected LPB's contention it would require a factual determination to rule that there was no damage at all, as Belco and Devito argued, explaining, "Plaintiff does not direct the court to any facts that would support this supposed dispute of fact. Had Plaintiff pointed the court to some actual evidence, it would have been inclined to find that there is a material dispute of fact. Because Plaintiff failed to do so, the court cannot find such a dispute of fact."

LPB filed its notice of appeal from the order granting summary judgment on May 20, 2021. As of that date, no judgment (that is, no appealable order) had been entered in favor of Belco and Devito. (See generally *Wilkin v. Community Hospital of Monterey Peninsula* (2021) 71 Cal.App.5th 806, 820 ["An order granting summary judgment is not an appealable order. [Citation.] An appeal must be taken from a judgment entered based on an order granting summary judgment"].) Judgment was finally entered on January 3, 2023 at this court's instruction.[7]

## DISCUSSION

1. *Standard of Review*

A motion for summary judgment is properly granted only when "all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c,

---

[7]     An amended judgment was entered on January 4, 2023.

14

subd. (c).)  We review a grant of summary judgment de novo (*Samara v. Matar* (2018) 5 Cal.5th 322, 338) and, viewing the evidence in the light most favorable to the nonmoving party and drawing all reasonable inferences in favor of that party (*Weiss v. People ex rel. Department of Transportation* (2020) 9 Cal.5th 840, 864; *Regents of University of California v. Superior Court* (2018) 4 Cal.5th 607, 618), decide independently whether the facts not subject to triable dispute warrant judgment for the moving party as a matter of law.  (*Hampton v. County of San Diego* (2015) 62 Cal.4th 340, 347; *Schachter v. Citigroup, Inc.* (2009) 47 Cal.4th 610, 618.)

When a defendant moves for summary judgment in a situation in which the plaintiff would have the burden of proof at trial by a preponderance of the evidence, the defendant may, but need not, present evidence that conclusively negates an element of the plaintiff's cause of action.  Alternatively, the defendant may present evidence to "'show[] that one or more elements of the cause of action . . . cannot be established' by the plaintiff." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 853 (*Aguilar*); accord, *Regents of University of California v. Superior Court, supra,* 4 Cal.5th at p. 618 ["[a] defendant seeking summary judgment must show that the plaintiff cannot establish at least one element of the cause of action"]; Code Civ. Proc., § 437c, subd. (p)(2).)  "The moving party bears the burden of showing the court that the plaintiff has not established, and cannot reasonably expect to establish, the elements of his or her cause of action."  (*Ennabe v. Manosa* (2014) 58 Cal.4th 697, 705, internal quotation marks omitted; accord, *Wilson v. 21st Century Ins. Co.* (2007) 42 Cal.4th 713, 720; see *Kahn v. East Side Union High School Dist.* (2003) 31 Cal.4th 990, 1002-1003 ["the

defendant must present evidence that would preclude a reasonable trier of fact from finding that it was more likely than not that the material fact was true [citation], or the defendant must establish that an element of the claim cannot be established, by presenting evidence that the plaintiff 'does not possess and cannot reasonably obtain, needed evidence'"].)

Once the defendant's initial burden has been carried, the burden shifts to the plaintiff to demonstrate, by reference to specific facts, not just allegations in the pleadings, there is a triable issue of material fact as to the cause of action.  (Code Civ. Proc., § 437c, subd. (p)(2); *Aguilar*, *supra,* 25 Cal.4th at p. 850.) "There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof" at trial. (*Aguilar*, at p. 850; accord, *Lugtu v. California Highway Patrol* (2001) 26 Cal.4th 703, 722.)

2. *Governing Law*

A cause of action for malicious prosecution consists of three primary elements.  "The underlying action must have been: (i) initiated or maintained by, or at the direction of, the defendant, and pursued to a legal termination in favor of the malicious prosecution plaintiff; (ii) initiated or maintained without probable cause; and (iii) initiated or maintained with malice." (*Parrish v. Latham & Watkins* (2017) 3 Cal.5th 767, 775; accord, *Crowley v. Katleman* (1994) 8 Cal.4th 666, 676.)  The plaintiff must also prove "resulting damage." (*Drummond v. Desmarais* (2009) 176 Cal.App.4th 439, 449; accord, *Sierra Club v. Superior Court* (1985) 168 Cal.App.3d 1138, 1144; see also CACI No. 1501 [to establish a claim for wrongful use of civil

16

proceedings, plaintiff must prove, among other elements, that plaintiff was harmed and defendant's conduct was a substantial factor in causing plaintiff's harm].)

"[T]he measure of compensatory damages for the malicious prosecution of a civil action includes attorney fees and court costs for defending the prior action and compensation for emotional distress, mental suffering and impairment to reputation proximately caused by the initiation and prosecution of the action." (*Bertero v. National General Corp.* (1974) 13 Cal.3d 43, 59; see *Jackson v. Yarbray* (2009) 179 Cal.App.4th 75, 90 ["[a] malicious prosecution action provides a remedy for a party that has 'suffered out of pocket loss in the form of attorney fees and costs, as well as emotional distress and injury to reputation because of groundless allegations made in pleadings which are public records'"].)

3. *LPB Failed To Present Admissible Evidence That Belco's Pursuit of Its Cross-complaint Caused Any Future Lost Profits*

LPB has steadfastly maintained that Belco's refusal to meet its payment obligations after acquiring LPB's assets—Belco's breach of contract—led to LPB's inability to restart the business with a reduced workforce and a more focused effort to target major subcontracts for transportation electrical work, including its failure to reinstate its suspended contractor's license, resulting in millions of dollars in lost profits.[8]  Belco first

---

[8]      LPB could have but did not seek to recover its claimed lost profits in its breach of contract action.  (See *Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 773 ["[l]ost profits may be recoverable as damages for breach of a contract"].)

missed a payment in September 2013 and finally paid the full amount due on the contracts in August 2016. LPB contends this three-year delay in payment was due to Belco's litigation of the cross-complaint, yet presented no admissible evidence that supports its position.

As discussed, in their moving papers Belco and Devito presented evidence LPB's lost profits, if any, were caused by Belco's failure to make required payments on the parties' contracts and suspension of LPB's contractor's license, not litigation of the cross-complaint, and LPB's claim for lost profits was, in any event, unduly speculative, thereby shifting to LPB the burden of establishing the existence of triable issues of material fact precluding summary judgment. As Belco and Devito emphasized, the cross-complaint was not filed until December 2014, 15 months after the original breach of contract. Plainly, then, filing and prosecuting the cross-complaint had no causal relationship to any damages purportedly incurred during that period.

As for the remaining period between December 2014 and August 2016, LPB insists the delay in payment, and LPB's consequent inability to reinstate its contractor's license and bid on new subcontracts, was due in substantial part to Belco's maintenance of the cross-complaint, not simply to Belco's denial of liability in the contract action. (To reiterate, Belco's answer not only denied liability but also asserted as an affirmative defense that it had a right to offsets that would bar or reduce any amounts that might be due).[9] Whatever the logic of LPB's

---

[9] Reinforcing the position asserted in an affirmative defense by pursuing a cross-complaint with malice and without probable cause is generally actionable, allowing the plaintiff and cross-

18

contention that payment was delayed because of the cross-complaint, not Belco's denial of liability—after all, Belco continued to litigate its cross-complaint for more than a year after it paid LPB the full amount allegedly due, plus prejudgment interest—the only evidence LPB attempted to introduce to support its theory—statements made to LPB's counsel at a mediation and Belco's mediation brief—was properly excluded by the trial court.[10]

LPB argues the trial court erred in sustaining the objections to this evidence, citing *HMS Capital, Inc. v. Lawyers Title Co.* (2004) 118 Cal.App.4th 204, which held settlement discussions concerning the underlying litigation are admissible in a malicious prosecution suit as evidence of improper purpose. (*Id.* at p. 219.) Because the discussions at issue in that case did not take place during a mediation, however, our colleagues in

---

defendant to recover attorney fees incurred to defend against the cross-complaint and any damages for harm to reputation and emotional distress that are proved. (See *Bertero v. National General Corp., supra,* 13 Cal.3d at p. 53 ["By seeking affirmative relief . . . , defendants in the instant case did more than attempt to repel [plaintiff]'s attack; they took the offensive in attempting to prosecute a cause of action of their own. When such action is prompted by malice and is not based on probable cause, it is actionable as in the case of other affirmative, malicious prosecutions"].) Here, as discussed, LPB is not seeking its attorney fees, which have already been paid, and it failed to prove injury to its reputation.

[10] Objections to the evidence were based on both the mediation privilege and the limited privilege for offers of compromise. The court sustained the objections without indicating the grounds for its ruling.

19

Division Three of this court in *HMS Capital* discussed only Evidence Code sections 1152 and 1154, statutes prohibiting use of settlement negotiations to show liability or invalidity of a claim, not the mediation privilege of Evidence Code section 1115 et seq. (*HMS Capital,* at p. 1219.) Here, in contrast, it is undisputed the settlement offer referring to the cross-complaint reported by LPB's counsel was made during a mediation and Belco's brief was submitted in the course of the mediation—material unquestionably privileged and inadmissible in LPB's malicious prosecution action. (See generally *Cassel v. Superior Court* (2011) 51 Cal.4th 113, 127 ["[T]he Legislature intended the unambiguous provisions of the mediation confidentiality statutes to be applied broadly [citation], that exceptions are limited to narrowly prescribed statutory exemptions, and that '[e]xcept in cases of express waiver or where due process is implicated' [citations], mediation confidentiality must be strictly enforced, even where competing policy considerations are present"]; *id.* at p. 132 ["[t]he mediation confidentiality statutes govern only the narrow category of mediation-related communications, but they apply broadly within that category, and are designed to provide maximum protection for the privacy of communications in the mediation context"].)

Given LPB's acknowledgement it was Belco's failure to pay sums due under the 2013 contracts that caused its loss of future profits (if any), in the absence of admissible evidence that Belco's filing and continued prosecution of a cross-complaint seeking affirmative relief aggravated LPB's dire financial situation, the trial court correctly concluded LPB had failed to establish a disputed issue of material fact as to this aspect of its malicious prosecution claim.

20

4. *LPB Failed To Present Admissible Evidence That Future Lost Profits Were Certain*

The trial court's alternate, related ruling that LPB failed to present evidence establishing the fact of lost future profits with the requisite degree of certainty was also correct.

The Supreme Court in *Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747 summarized the principles governing a claim of lost future profits as a measure of damages: "'[T]he general principle [is] that damages for the loss of prospective profits are recoverable where the evidence makes reasonably certain their occurrence and extent.' [Citation.] Such damages must 'be proven to be certain both as to their occurrence and their extent, albeit not with "mathematical precision."' . . . [¶] Regarding lost business profits, the cases have generally distinguished between established and unestablished businesses. '[W]here the operation of an established business is prevented or interrupted, as by a . . . breach of contract . . . , damages for the loss of prospective profits that otherwise might have been made from its operation are generally recoverable for the reason that their occurrence and extent may be ascertained with reasonable certainty from the past volume of business and other provable data relevant to the probable future sales.' . . . [¶] 'On the other hand, where the operation of an unestablished business is prevented or interrupted, damages for prospective profits that might otherwise have been made from its operation are not recoverable for the reason that their occurrence is uncertain, contingent and speculative. [Citations.] . . . But although generally objectionable for the reason that their estimation is conjectural and speculative, anticipated profits dependent upon future events

are allowed where their nature and occurrence can be shown by evidence of reasonable reliability.' [Citation.] [¶] 'Where the *fact* of damages is certain, the amount of damages need not be calculated with absolute certainty.'" (*Id.* at pp. 773-775.)

At the relevant time LPB was effectively a new business, subject to the heightened requirement for showing the fact of lost profits by evidence of reasonable reliability. As of mid-September 2013 when Belco first breached its contract with LPB, LPB had no hard assets (that is, no equipment, no tools, no vehicles and no warehouse), no employees other than Chan and no work in process or commitments for future work. Its contractor's license had been suspended, and it had lost its MBE/DBE designation. It did have some remaining capital—LPB's accounts receivables, which were not transferred to Belco, and the anticipated payments from Belco—as well as residual goodwill. With that, Chan testified, he planned to restart a scaled-down version of the company.[11]

Mid-September 2013, however, is not the pertinent time for establishing a claim for lost profits in the malicious prosecution action, rather than LPB's original breach of contract lawsuit. As of December 2014 when the cross-complaint was filed, the difficulties confronting LPB had only increased. It remained a shell company with no hard assets, no employees, no contractor's license and no MBE/DBE designation. Although Pena, a former employee, told Chan in 2013 he was willing to rejoin LPB if it was able to financially restructure, there is no evidence in the record that Pena or any other former management or line

---

[11]    LPB's agreements with Belco did not include a noncompete provision.

employee would have been willing to do so 15 months later. Similarly, there is no evidence concerning any remaining capital (accounts receivable) available to LPB in December 2014, nor is there any evidence as to the significance or value, if any, of LPB's goodwill more than a year after it ceased doing any business.

Against this backdrop LPB's historic record—the sometimes positive cash flow it generated between 2005 and 2012—is not probative of what an entirely restructured, scaled-down company might have been able to accomplish beginning in December 2014; and its evidence, even if admissible, that at some point between 2013 and 2016—a four-year time span that includes two years before Belco's cross-complaint was filed[12]—Engler said LPB's participation in the Crenshaw/LAX project would be welcome falls far short of creating a triable issue of fact that future profits were relatively certain but for Belco's malicious pursuit of its cross-complaint. As the trial court observed, welcoming a proposal from a company does not assure the subcontract will be awarded to it; and, as Chan admitted, when LPB performed a contract, earning a profit was not guaranteed.

---

[12] Although Chan's declaration does not state when the conversation with Engler occurred, read in context Chan suggests it was in 2013 while Chan was still anticipating payments from Belco would continue. Engler was similarly vague. He stated he was business manager of the joint venture building the Crenshaw/LAX project between 2013 and 2016 and had the conversation with Chan "in this time frame." Engler, who presumably would know, did not include in his declaration the date construction on the project began or when the subcontract he referred to was let.

23

5. *LPB Failed To Present Admissible Evidence That Its Reputation Was Injured*

Effectively conceding it presented no admissible evidence of actual injury to its reputation as a result of Belco's filing and prosecution of the cross-complaint,[13] in its response to Belco and Devito's separate statement of undisputed facts (but not its memorandum in opposition to the motion), LPB asserted that falsely accusing a company of fraud is defamation per se. As such, LPB argues in its briefing in this court, general damages are presumed, no proof is required, and the trial court erred in summarily deciding the reputational injury claim as a matter of law.

LPB is certainly correct that a false and unprivileged written statement, defamatory on its face—that is, without the necessity of explanatory matter—is actionable without proof the plaintiff has suffered special damages as a proximate result of the statement's publication. (Civ. Code, §§ 44, 45a; see *Finney v. Lockhart* (1950) 35 Cal.2d 161, 163 [in an action for damages for defamation per se, "the law presumes general damages"]; *Tilkey v. Allstate Ins. Co.* (2020) 56 Cal.App.5th 521, 542 ["[i]n an action for defamation per se, the meaning is so clear from the face of the statement that the damages can be presumed"].) A jury may

---

[13]     LPB on appeal does not challenge the trial court's ruling sustaining the objection to the portion of Chan's declaration stating he heard from an unspecified source that Walter's Electric Wholesale had been telling people about LPB's fraudulent dealings with Belco and asserting Belco had to be the source of those comments. As discussed, with their moving papers Belco and Devito included Chan's deposition testimony providing essentially the same information and nothing else to support the claim of reputation injury.

24

award as compensation for the assumed harm whatever sum it believes is reasonable.  (See CACI No. 1704.)

LPB did not plead a cause of action for defamation, however, and for good reason.  The only admissible evidence of Belco's statements accusing LPB of fraud or dishonesty was contained in its cross-complaint in the underlying litigation.  As LPB necessarily acknowledges, those allegations would be fully protected by Civil Code section 47, subdivision (b)'s absolute litigation privilege in a defamation action.  (See *Rusheen v. Cohen* (2006) 37 Cal.4th 1048, 1057; *Silberg v. Anderson* (1990) 50 Cal.3d 205, 215-216; *Weeden v. Hoffman* (2021) 70 Cal.App.5th 269, 289-290.)

While it is also correct that LPB's lawsuit for malicious prosecution falls within the lone tort claim exception to the litigation privilege (see, e.g., *Flatley v. Mauro* (2006) 39 Cal.4th 299, 322 [the litigation privilege "is 'an "absolute" privilege, and it bars all tort causes of action except a claim of malicious prosecution'"]; *Rusheen v. Cohen*, *supra*, 37 Cal.4th at p. 1057 [the litigation privilege is applicable to "'all torts except malicious prosecution'"]), as discussed, one of the essential elements of a cause of action for malicious prosecution is proof of resulting damage.  (E.g., *Drummon v. Desmarais*, *supra*, 176 Cal.App.4th at p. 449.)  LPB cites no authority, and we are aware of none, nor does it offer any policy rationale to support its attempt to export the notion of presumed damages to a lawsuit for malicious prosecution, a cause of action that has traditionally been described as "disfavored."  (See, e.g., *Siebel v. Mittlesteadt* (2007) 41 Cal.4th 735, 740; *Dorit v. Noe* (2020) 49 Cal.App.5th 458, 472.)

To be sure, the harm inflicted by the pursuit of groundless litigation, motivated by malice, justifies excepting a malicious

25

prosecution action from the scope of the protection afforded by Civil Code section 47, subdivision (b).  (See generally *Crowley v. Katleman*, *supra*, 8 Cal.4th at p. 695 ["when *the litigation is groundless and motivated by malice* the balance tips in favor of the policy of redressing the individual harm inflicted by that litigation"].)  But courts have "carefully circumscribed" the elements of the tort, "so that litigants with potentially valid claims will not be deterred from bringing their claims to court." (*Sheldon Appel Co. v. Albert & Oliker* (1989) 47 Cal.3d 863, 872; accord, *Dorit v. Noe*, *supra*, 49 Cal.App.5th at p. 472.)  LPB's proposed expansion of a malicious prosecution action to allow for recovery of presumed damages based on the inclusion of defamatory allegations in the pleading initiating an underlying action—damages not recoverable in a defamation suit—would constitute just such an unwarranted expansion of the tort.

In sum, because LPB made no claim for attorney fees and costs as damages and failed to present admissible evidence that Belco's filing and prosecution of its cross-complaint was responsible for any lost future profits or caused actual injury to its reputation, the trial court properly granted Belco and Devito's motion for summary judgment.

## DISPOSITION

The judgment is affirmed.  Belco and Devito are to recover their costs on appeal.

PERLUSS, P. J.

We concur:

SEGAL, J.            FEUER, J.

26